FILED
United States Court of Appeals
Tenth Circuit

February 10, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JUAN ANTONIO VAZQUEZ,

Defendant - Appellant.

No. 08-4044

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH[*]
(D.C. NO. 2:06-CR-00196-TC-1)**

---

Submitted on the briefs:

Steven B. Killpack, Federal Public Defender, and Scott Keith Wilson, Assistant Federal Public Defender, Salt Lake City, Utah, for the Defendant - Appellant.

Brett L. Tolman, United States Attorney, and Jared C. Bennett, Assistant United States Attorney, Salt Lake City, Utah, for Plaintiff - Appellee.

---

Before **BRISCOE**, **EBEL**, and **HARTZ**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

---

[*]After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Juan Antonio Vazquez was convicted by a jury of possession of methamphetamine with intent to distribute, based on the discovery of three pounds of the drug in the car he had been driving on I-15 in Utah. On appeal he raises two challenges: (1) the initial stop of his car, the duration of his detention, and the search of the car violated his rights under the Fourth Amendment; and (2) the district court improperly admitted expert testimony by a law-enforcement officer. We have jurisdiction under 28 U.S.C. § 1291 and affirm.

## I. BACKGROUND

### A. Traffic Stop

In the early hours of March 24, 2006, Cedar City Police Officer Jason Thomas received a phone call from a Nevada drug-interdiction agent. The agent told Thomas that his team had just stopped a car driven by Mr. Vazquez and had observed several indicators of drug trafficking. Mr. Vazquez had refused to consent to a search of the car, and no drug dog had been available, so he had been allowed to go on his way. After letting him go, the Nevada team had learned that Mr. Vazquez was on a Drug Enforcement Administration (DEA) watch list. The agent relayed to Thomas the make, model, and license-plate number of the car driven by Mr. Vazquez.

Officer Thomas in turn passed this information on to Iron County Sheriff's Deputy Jeff Malcom. Thomas and Malcom met on the side of the freeway at

3:45 a.m. and briefly discussed Mr. Vazquez. Afterwards, as Malcom was pulling back onto I-15, he saw a car traveling in the fast lane but keeping pace with a tractor-trailer traveling in the slow lane as it passed the point where the officers had talked. It appeared to Malcom that the car was trying to stay out of his sight, and he began following the car. As he drew closer, he saw that it matched the description of Mr. Vazquez's car.

While calling in the car's license number to his dispatcher, Malcom saw Mr. Vazquez drift roughly one foot into the right-hand lane without signaling. He contacted Thomas and switched on his dashboard video camera. He observed the vehicle drift out of its lane twice more, despite the fairly straight road and favorable weather conditions. On the advice of Thomas, who was now en route with his drug dog, Malcom stopped Mr. Vazquez.

Malcom walked up to Mr. Vazquez's car and spoke to him through the car's passenger-side window, which Mr. Vazquez had rolled down. Malcom informed Mr. Vazquez of his traffic infraction and asked for his driver's license, registration card, and insurance document. Mr. Vazquez said that he did not have his license and provided an identification card along with an Illinois citation that contained his license number. He explained that he had received a ticket in Illinois and his license was being held until he paid his fine. He also gave Malcom a Tennessee registration document showing the owner as Melissa Brooke Shoup in Memphis.

Malcom thought that Mr. Vazquez's answers to his routine traffic-stop questions seemed hurried and rehearsed. He also noticed what he took to be several possible signs of attempts to conceal drug trafficking: an air freshener, a laptop computer on the front seat, and a business suit hanging in the back seat. Taken together with Mr. Vazquez's late-night travel, he became suspicious, although he did not question Mr. Vazquez about the matters giving rise to his suspicion. Malcom took the documents back to his car and awaited Thomas, who arrived less than 30 seconds later. He gave Thomas Mr. Vazquez's documents.

The two officers briefly discussed how they would proceed. About four minutes after the initial stop, Thomas (without his dog) approached Mr. Vazquez's car and asked Mr. Vazquez to accompany him back to his police car while he handled the paperwork. Thomas testified that he asked Mr. Vazquez to accompany him so that he could see whether Mr. Vazquez was impaired and could avoid the need to go back to Mr. Vazquez if Thomas had missed getting necessary information. As had Malcom, Thomas noticed in Mr. Vazquez's car what he recognized as common indications of drug trafficking: a key in the car's ignition that was the only one on its chain, two energy-drink cans, a laptop and suit, the cleanliness of the car, and the absence of other luggage.

In the officer's car Mr. Vazquez explained that he had drifted into the other lane because it was windy and his car had small tires. He also repeated the explanation he had given Malcom for not having a driver's license. While

Thomas wrote out the traffic citation, he ran a check on Mr. Vazquez that revealed that the driver's license was valid but that he had a criminal history of cocaine trafficking. In response to further questioning by Thomas, Mr. Vazquez said that he lived in Normal, Illinois, where he had an auto-repair business. He was returning home after visiting his children in Las Vegas. For the trip he had borrowed the car from his girlfriend of four years, who lived in Tennessee, because it was more fuel-efficient than his own. When asked for his girlfriend's name, Mr. Vazquez gave it as Brooke Shepard and then Melissa Brooke Shepard. He had difficulty responding to a question about her employment, pausing for some time before answering that she was between jobs. Thomas then suggested that Melissa Brooke Shepard was not the person to whom the car was registered. Mr. Vazquez responded that his girlfriend might have registered the car under her maiden name of Shoup. Mr. Vazquez said that he had his girlfriend's phone number stored in his cell phone, which was in his car. (Although the record is not clear on this point, it appears that while Mr. Vazquez was with Thomas in Thomas's car, Malcom determined that the car driven by Mr. Vazquez had not been reported stolen, but he may not have advised Thomas of this until later.)

Thomas, who was apparently completing his paperwork, then asked a series of questions about contraband Mr. Vazquez might have in the car. Mr. Vazquez answered "no" to questions about weapons, cocaine, and heroin, but altered his body language in answering "no" when asked about methamphetamine.

-5-

At this point, 19 minutes after the initial stop, Thomas asked Mr. Vazquez for consent to search his vehicle. Mr. Vazquez refused. Thomas then told Mr. Vazquez that he was going to have his dog sniff the car's exterior while Mr. Vazquez and Malcom tried to reach the vehicle's owner. About three minutes later, the drug dog, Gino, began the sniff. Gino alerted at the car's front and rear bumpers. Gino then leapt through the open passenger-side window and alerted in the car's back seat.

Thomas told Mr. Vazquez that the alerts gave the officers probable cause to search the car for narcotics. A brief search at the roadside did not yield any contraband. Thomas moved the car to the sheriff's office. The search there yielded a container of methamphetamine in front of the passenger-side front wheel well. Mr. Vazquez was arrested for possession of methamphetamine.

## B.    Pretrial Proceedings

Before trial Mr. Vazquez sought to suppress all statements and evidence derived from the traffic stop and ensuing search. Among other contentions, he argued that the stop and his continued detention were not based on reasonable suspicion of criminal activity and that the officers lacked probable cause to search the car. The district court conducted an evidentiary hearing and denied the motion. *See United States v. Vazquez*, No. 2:06-cr-196 TC, 2007 WL 853764 (D. Utah. Mar. 16, 2007). It found that Mr. Vazquez's car had crossed lanes on three occasions, justifying the initial stop, and that the drug dog had alerted three

times, providing probable cause for the search. It also decided that the detention from the time of the stop to the time of the alerts was reasonable. On appeal Mr. Vazquez challenges the initial stop, the duration of the detention, and the search of the vehicle.

Also before trial Mr. Vazquez filed a motion in limine t o exclude the expert testimony of DEA Special Agent Jeffery Bryan under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The district court held a hearing at which the government called Bryan as a witness to provide the testimony he would give at trial. He testified regarding his training, his extensive experience in drug-trafficking investigations (including undercover drug purchases), his work and contacts with drug agents in other jurisdictions, the methamphetamine quantities handled by traffickers at different levels of the distribution chain, the drug's pricing, and "fronting" (trade-credit) arrangements between traffickers. The district court denied Mr. Vazquez's motion, saying:

> [T]here is no way in this business, this area of expertise, that there's anything other than experience and on-the-job training, and the seminars and the years of experience and hundreds of cases. And that's what drug experts typically base their opinions on, and I don't find anything unreliable in that methodology given these broad standards.

R. Vol. IV at 35.

On appeal Mr. Vazquez does not challenge Bryan's trial testimony on topics presented at the pretrial hearing. Rather, he complains of Bryan's testimony regarding the ways that drug traffickers attempt to avoid detection.

## II.     DISCUSSION

### A.      Fourth Amendment Issues

"When reviewing the denial of a motion to suppress, we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless clearly erroneous, and review de novo the ultimate determination of reasonableness under the Fourth Amendment."  *United States v. Apperson*, 441 F.3d 1162, 1184 (10th Cir. 2006) (internal quotation marks omitted).  We address in sequence the validity of the officers' actions from the initial stop to the vehicle search.[1]

### 1.      The Initial Stop

"A traffic stop is permissible under the Fourth Amendment if the officer has a reasonable articulable suspicion that a traffic violation has occurred or is occurring."  *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1257–58 (10th Cir. 2006) (ellipsis and internal quotation marks omitted).  The initial stop of Mr. Vazquez was supported by reasonable suspicion that he had violated a Utah traffic law.

Utah requires motorists to drive "as nearly as practical entirely within a single lane."  Utah Code Ann. § 41-6a-710(1)(a) (1953).  Because of the statute's

---

[1]We need not address Mr. Vazquez's standing to raise his Fourth Amendment claims, because we hold that there was no Fourth Amendment violation.  *See United States v. Scarborough*, 128 F.3d 1373, 1377 n.2 (10th Cir. 1997).

-8-

"as nearly as practical" language, a vehicle may weave slightly without violating the law if there are adverse conditions (high winds, sharp curves, damaged pavement). *See United States v. Alvarado*, 430 F.3d 1305, 1308 (10th Cir. 2005). But absent such conditions, when police officers observe a vehicle depart from a lane, they have reasonable suspicion to stop the vehicle. *Id.* at 1308–09. We made it clear in *United States v. Cline*, 349 F.3d 1276, 1287 (10th Cir. 2003), that even a single instance of drifting may violate a statute like the one at issue here.

The district court found that there were no adverse road or weather conditions that might have made it difficult for Mr. Vazquez to keep his car in one lane. This finding was not clearly erroneous. Although Mr. Vazquez blamed the wind and small tires for his car's admitted lateral movements, the court could reasonably credit Malcom's testimony that it was not windy at the time of the stop and that in any event Mr. Vazquez's 2003 Honda Civic was a low-profile compact car unlikely to be affected by the wind.

Mr. Vazquez argues that the video of the pursuit captured by Malcom's dashboard camera contradicts Malcom's testimony because it "simply does not show Mr. Vazquez weaving or otherwise crossing any road lines." Aplt. Br. at 13. The district court, however, believed Malcom. Although the video is not clear—it was shot from a moving car at night—the court's finding is not without evidentiary support. *See United States v. Jarvison*, 409 F.3d 1221, 1224 (10th Cir. 2005) ("A finding of fact is not clearly erroneous unless it is without factual

support in the record, or unless the court after reviewing all the evidence is left with a definite and firm conviction that the district court erred." (internal quotation marks omitted)). Moreover, Malcom testified that he did not activate the camera until he had already observed one lane violation. Accordingly, we affirm the district court's ruling that the initial stop was lawful.

### 2. Length of Detention

Mr. Vazquez argues that even if the initial stop was lawful, the length of his detention—up to and including the dog sniff—could not be justified. "Generally, an investigative detention must last no longer than is necessary to effectuate the purpose of the stop." *United States v. Cervine*, 347 F.3d 865, 870–71 (10th Cir. 2003) (internal quotation marks omitted). This means that the officer, absent the driver's consent, ordinarily may not do more than ask to see a driver's license and registration and insurance documents, run a computer check on the car and driver, inquire about the driver's travel plans, and write out a citation. *Id.* at 871. But the officer may delay the driver for further investigation if the officer has an objectively reasonable, articulable suspicion of some illegal activity beyond the traffic violation. *See United States v. Bradford*, 423 F.3d 1149, 1156–57 (10th Cir. 2005).

Mr. Vazquez contends that he was detained "after his documents had been run without a problem." Aplt. Br. at 16. We disagree. Both documents that Mr. Vazquez gave to Malcom presented problems. (He also failed to provide

proof of insurance, which may well have been a third problem, although the officers did not pursue this matter during the stop.)  Rather than a driver's license, Mr. Vazquez had only a citation from another state.  He explained to the officers that he had received a ticket in Illinois and that the Illinois authorities were holding his license as a bond until he paid the associated fine.  Perhaps this was a valid explanation, but Thomas—whose work presumably did not bring him into regular contact with Illinois motor-vehicle laws—needed to check it out.  Although the license proved to be valid, the detention while that was being determined was lawful.  More importantly, the vehicle registration created reasonable suspicion.  It was not in Mr. Vazquez's name.  He explained that he had borrowed the car from his girlfriend to save gas.  But he said that she lived in Tennessee whereas he lived in Normal, Illinois; he initially provided a last name for her that was different from the one on the registration card; and when asked about her occupation, he took a peculiarly long time to respond that she was between jobs.  It was proper for the officers to take the time to follow up on these matters to determine, among other things, whether Mr. Vazquez's possession of the car was lawful.  *See United States v. Lopez*, 777 F.2d 543, 547–48 (10th Cir. 1985) ("mere presence of the technically proper registration in the glove compartment of the vehicle did not necessarily remove the officers' concern" as to lawful possession by the occupants, neither of whom was the registered owner).

Mr. Vazquez has not pointed to, and we have not found, any nontrivial period of his detention from the initial stop to the dog alert when the officers were not conducting proper follow-up. *See Alcaraz-Arellano*, 441 F.3d at 1259 (questioning that extends detention only minimally does not render detention unreasonable). In particular, while the dog sniff was being conducted, Malcom and Mr. Vazquez were locating the phone number of Mr. Vazquez's girlfriend in his cell phone's memory so that the officers could confirm her ownership of the car and his right to be driving it.

Mr. Vazquez faults the officers for failing to call the number he provided for his girlfriend, which he says would have cleared up any concern about unlawful possession of the car. But because the dog sniff quickly generated probable cause to search the car, contacting the purported owner took on secondary importance. Even if it would have been good police work to call the girlfriend, the failure to do so neither violated Mr. Vazquez's rights nor suggests that the officers' account of events was falsified.

### 3. The Car Search

Finally, Mr. Vazquez argues that the officers lacked probable cause to search the car. We reject this challenge as well. Once Gino alerted to the vehicle's front and rear bumpers, the officers had probable cause to search the car and its contents. *See United States v. Stewart*, 473 F.3d 1265, 1270 (10th Cir. 2007). His more pronounced alert inside the vehicle shored up that probable

-12-

cause. Under the automobile exception to the Fourth Amendment's warrant requirement, "police officers who have probable cause to believe there is contraband inside an automobile that has been stopped on the road may search it without obtaining a warrant." *Florida v. Meyers*, 466 U.S. 380, 381 (1984) (per curiam). Moreover, "[o]nce the officer[s'] suspicions rise to the level of probable cause, they are empowered to search the entire vehicle, including the trunk and all containers therein that might contain contraband." *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008) (internal quotation marks omitted). Thus, the officers' search of the vehicle did not violate the Fourth Amendment.

Mr. Vazquez contends that Gino's alerts outside the vehicle were "minimal at best." Aplt. Br. at 21. The district court, however, found that they were legitimate alerts, and nothing suggests that this fact finding was clearly erroneous. *See United States v. Sukiz-Grado*, 22 F.3d 1006, 1009 (10th Cir. 1994) (reviewing for clear error a finding that drug dog alerted). In addition, Mr. Vazquez does not contest that probable cause was established by the alert after Gino jumped into the car. He questions the legitimacy of that sniff in the interior of the car, but we have upheld the legality of such a sniff during a lawful detention when, as here, (1) the dog's leap into the car was instinctual rather than orchestrated and (2) the officers did not ask the driver to open the point of entry, such as a hatchback or window, used by the dog. *See United States v. Stone*, 866 F.2d 359, 364 (10th Cir. 1989), *cf. United States v. Winningham*, 140 F.3d 1328, 1330–31 (10th Cir.

1998) (dog sniff of interior of vehicle was not lawful when detention of vehicle not justified by reasonable suspicion and officers had themselves opened the hatchback where dog entered the vehicle.)  The district court credited Thomas's testimony on both points.

## B.     Agent Bryan's Testimony

Mr. Vazquez's appellate briefs contain extensive discussions of his view of the law regarding the admissibility of expert testimony.  But our task is limited to considering the admissibility of specific testimony that he challenges on appeal.  We have no obligation to take on the role of his counsel and review the trial transcript to see whether we can find occasions when expert testimony was erroneously admitted.  The appellant must provide specific guidance regarding what testimony was improper.  *See United States v. Rodriguez-Aguirre*, 108 F.3d 1228, 1237 n.8 (10th Cir. 1997).

We therefore limit our review to the specific allegations of improper testimony recited in Mr. Vazquez's opening brief.  In none of these instances did Mr. Vazquez object at trial.  We therefore review for plain error.  *See United States v. Sinks*, 473 F.3d 1315, 1322 (10th Cir. 2007).  "To establish plain error, a defendant must show:  (1) an error, (2) that is plain, (3) that affects substantial rights and, (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *Id.* at 1321 (ellipsis, brackets, and internal quotation marks omitted).  Because Mr. Vazquez must establish each of these four elements, we

affirm if he fails with regard to any one of the four. *See United States v. Caraway*, 534 F.3d 1290, 1299 (10th Cir. 2008).

First, Mr. Vazquez challenges Bryan's following testimony: "I think it's pretty common knowledge that after 2:00 a.m. there aren't too many highway patrolmen on the road. And from my own experience, . . . I know that traffickers use the cover of darkness and nighttime to do a lot of their traveling." R. Vol. VIII at 142. Mr. Vazquez contends that it is common knowledge that drug traffickers favor night travel because fewer law-enforcement officers patrol the roads then, and expert testimony on the subject was therefore improper. The challenge borders on the frivolous. Mr. Vazquez has failed to carry his burden on the third element of plain error. Even if the testimony was inadmissible, Mr. Vazquez has not established prejudice to his substantial rights. Indeed, if what Bryan testified to was common knowledge, the jury presumably already knew it.

We similarly dispose of Mr. Vazquez's challenge to Bryan's statement that "even—a lay person, not just a police officer, would recognize these inconsistencies in the stories" some drug traffickers give law-enforcement officers about their travel plans. *Id.* Vol. VIII at 131. It escapes us how this testimony could have increased the chance that he would be convicted.

Finally, Mr. Vazquez objects to Bryan's testimony about drug traffickers' use of superficially innocent props, such as fishing equipment, and of hired

"pretend famil[ies]," saying these accounts were not "even remotely related to [his] alleged possession of drugs" and thus improperly led the jury to believe that "Mr. Vazquez's normal possession[s]—a business suit, laptop, energy drink, etc.—were evidence of drug possession." Aplt. Br. at 32. We note that the only testimony by Bryan that may have alluded to items in Mr. Vazquez's car was a reference to "clothing [displayed] to make it look like it's a business trip." R. Vol. VIII at 130. Otherwise, Bryan's testimony did not characterize the items as drug-trafficking props. Bryan's testimony about these practices may have been only minimally relevant, but it also had very little tendency to cause unfair prejudice. We hold that Mr. Vazquez has again failed to establish the third element of plain error.

## III.  CONCLUSION

We AFFIRM the judgment of the district court.