**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 12, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JULIO LOPEZ-MERIDA,

Defendant - Appellant.

No. 10-2244

(D. New Mexico)

(D.C. No. 1:08-CR-01841-JAP-2)

---

**ORDER AND JUDGMENT**[*]

---

Before **HARTZ**, and **HOLMES**, Circuit Judges, and **EAGAN**[**], District Judge.

---

Defendant Julio Lopez-Merida was convicted by a jury in the United States

District Court for the District of New Mexico of conspiracy and possession with

intent to distribute more than 100 kilograms of marijuana. The marijuana was

found in a tractor-trailer stopped on the highway by a state police officer who

observed what appeared to be an equipment problem. On appeal Defendant

argues (1) that the district court erred in refusing to suppress his statements and

---

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

[**]Honorable Claire V. Eagan, Chief Judge, United States District Court,
Northern District of Oklahoma, sitting by designation.

the marijuana, and (2) that his sentence was improper because the court erroneously found that the seized marijuana had a net weight exceeding 1000 kilograms.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. On the suppression issue, the only question we need address on the merits is the legality of Defendant's detention, and we reject Defendant's argument. On the sentencing issue, we hold that the district court's drug-quantity finding was not clearly erroneous.

## I.     BACKGROUND

On August 2, 2008, Defendant was driving a tractor-trailer eastbound on Interstate 40 west of Albuquerque, New Mexico. He was accompanied by a co-driver, Gil Manfredo Ruiz. After the vehicle passed the patrol car of New Mexico state police officer Arcenio Chavez, Chavez pulled it over because there appeared to be a loose air-brake hose between the tractor and the trailer that could be frayed on the tractor deck.

Defendant exited the tractor and met Chavez near the cab. Chavez told Defendant why he had stopped the vehicle and showed him the loose connection. He then asked Defendant to retrieve his log book and shipping papers, and both men walked to the officer's car.

When asked where he was coming from and what he was hauling, Defendant told Chavez that he was hauling watermelons from New York. The

bill of lading, however, showed that the cargo was cantaloupes headed to New York; and the log book indicated that the destination was Columbus, Ohio. When asked about the log book, Defendant replied, "Yeah, going from Columbus, yeah," R., Vol. 3 pt. 1 at 47, and, "Yeah, New York, but route is Columbus," *id.* Chavez observed that Defendant's hands were shaking and he appeared nervous.

Chavez further noted that the log book stated that Defendant had been off duty from July 27 to August 1, 2008, but that the bill of lading indicated that the cantaloupes had been picked up on July 30. Chavez asked Defendant where he had picked up the load. Defendant hesitated before replying, "Other driver," and "Modesto, California, I don't know." *Id.* at 46.

The signature of the person who picked up the load was illegible on the bill of lading, but it was different from Defendant's signature. Defendant said the signature belonged to the other driver. When asked on what day he had picked up the load, Defendant answered, "I don't remember." *Id.* Defendant told the officer that he spoke only a little English.

Ten minutes after the initial stop Chavez contacted the New Mexico Motor Transportation Division (MTD) for assistance. He then spoke with co-driver Ruiz. Ruiz's log book also said that he had been off duty from July 27 to August 1 and that his destination was Ohio. Ruiz confirmed that Columbus, Ohio, was his destination, and said that they had picked up the tractor-trailer the day before in "L.A." and in "Verno," where it had been parked on the street. *Id.* at 48. He

said that the owner of the vehicle was in California. At Chavez's request, Ruiz retrieved the trailer key from the passenger-side door and gave it to Chavez, who handed it to Defendant.

MTD Agent Joshua Perea arrived at the scene about 20 minutes after the stop. During his exterior inspection of the tractor-trailer, Perea observed a seal on the dog door (a small door used for ventilation). He thought this "very unusual," *id.* at 96, because some shippers require the door to be open and some drivers use it to access and look inside the trailer. Perea also noted that the temperature gauge registered 22 degrees in the trailer, whereas the bill of lading said that the temperature should be kept between 33 and 36. Meanwhile, Chavez issued Defendant a warning citation for the loose hose. He asked Defendant if he was sick because it appeared that he was about to vomit.

Perea next approached Ruiz and examined his log book. He noticed that it went back only six days, rather than the required seven, and that it showed that Ruiz had been off duty on July 30, the same day that the bill of lading said that the load had been picked up. When Perea asked Ruiz about his destination, he said that they were headed to New York, contradicting his statement to Chavez that they were going to Columbus, Ohio.

Perea then met Defendant behind the tractor-trailer. He examined Defendant's log book, which also did not cover the required seven days. Perea asked Defendant whether he had picked up the load, and he responded that he did

-4-

not speak much English.  Perea therefore tested his English proficiency.  *See* 49

C.F.R. § 391.11(b)(2) (requiring drivers of commercial motor vehicles to be

sufficiently proficient in English).  Defendant told Perea that he had filled out the

log book himself, but he could only scribble something illegible when Perea

requested him to write down where he had picked up the load, and Perea observed

that the destination of Columbus was printed suspiciously clearly in the log book.

Defendant failed the proficiency test, so Perea placed him out-of-service until he

passed a proficiency test.  About three minutes later, Perea placed Ruiz out of

service for 10 hours because of his incomplete log book.  The stop had occurred

38 minutes earlier.

Perea returned to his vehicle to consult with Chavez, review the log books

and the bill of lading, and complete his inspection report.  The officers discussed

the inconsistencies and peculiarities in the documents and the drivers' accounts,

the nervousness of the drivers, and the strong smell of air freshener in the cab of

the truck.  This took about 12 minutes.

Perea then instructed Defendant to open the trailer for a safety inspection of

the cargo (the first search).  Perea entered, soon followed by Chavez.  Perea

observed that the trailer's interior was dirty, the load smelled rotten, some cartons

of cantaloupe "had shifted and were leaning on the sidewall," R., Vol. 3 pt. 1 at

96, and an airbag was lying on top of the cartons where it "served no safety

purpose whatsoever."  *Id.*  From atop a ladder he saw that some cartons in the

first row were secured by banding, but that those in the second row had fallen over because they were not properly secured. He also saw shrink-wrapped packages behind the second row. Knowing that shrink wrap was inconsistent with produce packaging but consistent with drug packaging, he cut open a package, discovering what looked and smelled like marijuana.

Perea finished his inspection report, issued citations, and returned all paperwork to the drivers. Defendant and Ruiz were advised that they were free to leave. But because both men had been placed out of service, Perea explained that the tractor-trailer would need to be escorted to the next truck stop, about ten miles away, where they were to stay for ten hours.

Chavez then told Defendant and Ruiz that he had some additional questions. He asked them whether they were responsible for what was in the truck and whether they were carrying contraband. At Chavez's request, both men signed a form in Spanish consenting to a search of the trailer.

Chavez got his drug-detection dog from his vehicle, led it around the exterior of the tractor-trailer, and took the dog inside (the second search), where it alerted to the presence of drugs. Chavez saw the shrink-wrapped packages, which he believed to be marijuana. He arrested Defendant and Ruiz for possession of marijuana about 94 minutes after the traffic stop. Chavez recovered 101 packages of marijuana from the trailer.

After being indicted, Defendant unsuccessfully moved to suppress the evidence seized from the trailer and statements made to the officers. He nevertheless went to trial and was convicted on one count of possession with intent to distribute 100 kilograms or more of marijuana, *see* 21 U.S.C. § 841(a)(1), (b)(1)(B)(vii), and one count of conspiracy to commit the same offense, *see id.* § 846. At sentencing, the district court calculated Defendant's offense level based on its finding that the net weight of the marijuana in the trailer was 1,013.32 kilograms. *See* USSG § 2D1.1(c)(4). The court calculated a guidelines sentencing range of 151 to 188 months' imprisonment, but imposed concurrent sentences of 120 months. *See* 21 U.S.C. § 841(a)(1), (b)(1)(A).

## II.    DISCUSSION

### A.    Fourth Amendment Issues

Defendant devotes most of his brief on appeal to issues related to his motion to suppress. We need not address two of them. First, he challenges the district court's ruling denying him standing to argue certain matters; but we can assume that he has standing, because he loses on the merits. Second, he argues that the consent to search the trailer was invalid; but we can uphold the search on a ground other than consent, thereby mooting the consent issue. The four issues we will address (although three only briefly, because they have not been properly presented) are the validity of the initial stop, the duration of the detention of

-7-

Defendant and Ruiz, the validity of the first search, and the validity of the second search.

### 1. Initial Stop

Defendant claims that the traffic stop was invalid at its inception. But he failed to raise this argument in district court. The closest he came was in a sentence in his district-court reply brief stating that it was "unclear whether or not the alleged 'chaffing' [of the air-brake hose] actually constitutes a violation of the statute; if it does not, then arguably the entire stop could be deemed [to] be invalid." R., Vol. 1 at 89–90 (footnote omitted). This was inadequate to present the issue fairly to the district court for resolution, particularly when he failed to make this argument during the suppression hearing or in the posthearing briefing. We therefore hold that the issue has been waived. *See United States v. Burke*, 633 F.3d 984, 987 (10th Cir. 2011) (failure to include an argument in a motion to suppress waives that argument on appeal). Defendant has not suggested any ground for excusing the waiver.

### 2. Duration of the Stop

Next, Defendant argues that the officers' questioning was unrelated to the loose brake hose and impermissibly prolonged the detention, permitting the officers to acquire incriminating evidence. We reject the argument. We agree with Defendant that in general a traffic stop is reasonable only insofar as "it is (1) justified at its inception and (2) reasonably related in scope to the circumstances

which justified the interference in the first place." *United States v. Karam*, 496 F.3d 1157, 1161 (10th Cir. 2007) (internal quotation marks omitted). But during a traffic stop an officer can request the documents concerning the travel—such as driver's license, registration, rental contract, or, as here, the driver's log and shipping documents. *See id.*; *United States v. Rosborough*, 366 F.3d 1145, 1148 (10th Cir. 2004). The officer can also inquire about the trip being taken, *see United States v. Vazquez*, 555 F.3d 923, 928–29 (10th Cir. 2009), and can ask questions on any subject so long as the questioning does not prolong the detention beyond what is otherwise necessary to perform such routine tasks as computer checks and preparing reports and citations, *see Karam,* 496 F.3d at 1161. Moreover, if information obtained by such inquiries and other observations during the stop create reasonable suspicion to believe that a crime has been or is being committed, the officer can take reasonable steps to investigate. *See Vazquez*, 555 F.3d at 929.

Under these standards the detention of Defendant was constitutionally permissible. We need not repeat our earlier account of what happened. Suffice it to say that the information properly obtained by Chavez and Perea soon created reasonable suspicion concerning the legitimacy of Defendant's trip, and the investigation conducted by those officers was wholly reasonable.

### 3. First Trailer Search

Defendant contends that "Officer Perea's search exceeded his authority under New Mexico law." Aplt. Br. at 21. He advances two arguments. One is that the search by Perea was improper because the initial stop was invalid. We have already ruled, however, that he cannot challenge the initial stop. Defendant's second argument is that an MTD officer cannot conduct a search or inspection except at a port of entry. But the authority on which Defendant relies, *State v. Clark*, 816 P.2d 1122, 1123–24 (N.M. Ct. App. 1991), holds only that a random inspection, not based on reasonable suspicion, is improper if not at a port of entry. The district court correctly distinguished *Clark*, noting that reasonable suspicion supported inspection in this case. Defendant's brief on appeal does not address the reasoning of the district court and therefore the issue has been waived. *See United States v. Pursley*, 577 F.3d 1204, 1228 (10th Cir. 2009) ("applying the principle that arguments inadequately briefed in the opening brief are waived" (brackets and internal quotation marks omitted)).

### 4.    Second Trailer Search

As for the second search, it was clearly supported by probable cause based on Perea's observation of marijuana during the first search. *See United States v. Vasquez-Castillo*, 258 F.3d 1207, 1213 (10th Cir. 2001). Hence, it is irrelevant whether Defendant's consent to the second search was valid. We recognize that the issue of probable cause was not squarely joined in the briefing or oral argument on appeal. But the district court's opinion on the suppression motion

-10-

said that there was probable cause, and the government's answer brief on appeal noted that Defendant's opening brief had not challenged the court's finding. We therefore can uphold the second search on this ground.

**B.     Sentence**

Defendant argues that the district court erred in calculating his guidelines offense level because it had insufficient evidence that he possessed more than 1000 kilograms of marijuana. The court relied on the estimates of deputy sheriff Danny Joseph, who assisted in weighing it. He testified that the gross weight of the packages of marijuana was 1,066.65 kilograms and that the federal Drug Enforcement Agency generally subtracts 5% from the gross weight to calculate net weight because that is the average weight of packaging. He stated that the packaging in this case was "fairly standard" among the thousands of bundles of packaged marijuana that he had been exposed to, R., Vol. 3 pt. 4 at 698, although he conceded that these packages on average weighed about half what typical bundles weigh. Subtracting 5% from the gross weight in this case resulted in an estimated net weight of 1013.32 kilograms.

We review the district court's finding regarding weight for clear error. *See United States v. Middagh*, 594 F.3d 1291, 1295 (10th Cir. 2010). "The facts necessary to calculate the guidelines sentencing range must be proved by a preponderance of the evidence." *United States v. Flonnory*, 630 F.3d 1280, 1285–86 (10th Cir. 2011). Clear error exists only if a finding is "without factual

support in the record" or we are "left with a definite and firm conviction that a mistake has been made." *United States v. Maestas*, 642 F.3d 1315, 1319 (10th Cir. 2011) (internal quotation marks omitted).

Defendant criticizes Joseph's estimate as vague and nonspecific, pointing out that he used several qualifiers, such as "typically" and "on average," when he discussed calculating the marijuana's net weight. Aplt. Br. at 25 (brackets and internal quotation marks omitted). Defendant's argument has some merit. But it is not clearly erroneous for a district court to base its drug-quantity calculation on a law-enforcement officer's estimate of net weight when the estimate is based on the officer's relevant professional experience. *See United States v. Clonts*, 966 F.2d 1366, 1370–71 (10th Cir. 1992).

Defendant argues more specifically that because the average bundle here weighed half as much as a typical bundle, the packaging must have constituted a disproportionate amount of the weight. Perhaps. But Defendant offered no evidence that the lesser weight per bundle in this case resulted from the individual packages being less full than normal. On the contrary, Joseph testified that the packaging was "fairly standard." R., Vol. 3 pt. 4 at 698. Likewise, Defendant points out that the thickness of the packaging can, according to Joseph, range from one-quarter to one-half inch in thickness, so some packaging presumably can be twice as heavy as other packaging of the same quantity of marijuana. But he presented no evidence that the packaging here was on the thick side. In short,

although another reasonable judge could have made a different finding, the finding by the district court is not close to being clearly erroneous.

## III. CONCLUSION

We AFFIRM the judgment of the district court.

ENTERED FOR THE COURT


Harris L Hartz
Circuit Judge