**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 12, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

SHELDON McINTOSH,

    Defendant-Appellant.

No. 11-3331

(D.C. No. 2:09-CR-20133-JWL-9)
(D. Kan.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **LUCERO**, **BALDOCK**, and **TYMKOVICH**, Circuit Judges.
_____

A jury convicted Defendant Sheldon McIntosh of one count of conspiracy to possess with intent to distribute more than 1,000 kilograms of marijuana, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(vii).  Prior to trial, Defendant unsuccessfully sought to suppress evidence seized in the house where he was arrested.  He now appeals, raising three arguments.  First, he challenges the denial of the suppression motion.  Second, he argues the evidence introduced at trial varied from the crime charged in the indictment.  Third, he argues the Government violated the Interstate Agreement on Detainers.  We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

I.

The facts relating to the larger marijuana trafficking conspiracy involved in this case are set forth more fully in United States v. Stephen Blackburn, --- F. App'x ---, No. 11-3294 (10th Cir. 2013) (unpublished). The facts relevant to this appeal are as follows. At around 11:00 p.m. on May 1, 2007, dispatch sent Avondale (Arizona) Police Officer Reginald Sayles to a house on West Hubbell Street to attempt to locate a woman under investigation for assault in Surprise, Arizona. He parked two houses down from the residence and approached on foot. In order to reach the sidewalk leading to the front door, he had to cross the driveway. As he walked diagonally across the driveway, he "smelled a strong odor of fresh or unburned marijuana" that appeared to come from the attached garage. Record on Appeal ("ROA"), vol. II at 243. At the front door, he "still smelled the odor of strong, unburned marijuana," although the odor was strongest in front of the garage. Id. He then stepped off the sidewalk and tried to look through the window beside the front door, but he could see nothing through the closed blinds.

Officer Sayles called for backup, and the next officer to arrive also smelled "the overpowering odor of fresh marijuana" as he walked into the driveway. Id. at 325. Sayles's sergeant then arrived on the scene and also smelled marijuana. The officers requested a canine. Upon arrival, the dog alerted to the house and specifically to a vent above the garage. A police detective, Detective Martin, arrived on the scene and conferred with the officers. While Detective Martin returned to the police station and prepared a search warrant application, officers kept an eye on the house from a distance. At around 4:00 a.m., a van left the garage of the house, and headed toward Officer

Sayles's location with only its parking lights on. Officer Sayles stopped the van and made contact with the driver Curtis Pitter (who provided a false identity with the name Trevor Martin). When Pitter rolled down the van window, Sayles and another backup officer both smelled unburned marijuana. A search of the van yielded several garbage bags containing "Saran Wrap-type material that still had what appeared . . . to be the marijuana leaves still stuck to the wrapping," as well as axle grease, packing peanuts, and wood chips. ROA, vol. II at 252.

The officers on the scene telephoned the details of this stop to Detective Martin, and he added them to the search warrant affidavit. The affidavit explained that Officer Sayles and two backup officers had smelled marijuana coming from "the interior portion of the residence," but said nothing about the smell being stronger near the garage. ROA, supp. vol. II at 3. The affidavit said the drug-sniffing dog alerted generically to the "interior" of the residence. A Maricopa County judicial commissioner issued the search warrant, and the officers executed it on the morning of May 2. The officers found five men inside the house, including Defendant, his brother Samora McIntosh, Ibrahima Kane, Theodore McDowell, and Dwight Rhone. Defendant had grease stains on his clothing. Officers also found as second vehicle in the garage that contained approximately 630 pounds of marijuana in thirty boxes. The marijuana was wrapped in plastic and grease. The inside of the house contained drug packaging materials and $223,000 in cash hidden in a suitcase and a spare tire.

After Defendant's arrest, an Arizona jury convicted him on state drug charges. Later, a federal grand jury in the United States District Court for the District of Kansas

- 3 -

indicted him and nineteen other people on various drug-trafficking and money laundering charges. Specifically, the superseding indictment charged Defendant with conspiracy to possess with intent to distribute more than 1,000 kilograms of marijuana. Defendant and the other men arrested with him moved to suppress the evidence found in both the van and the house, but the district court denied their motions. When the case went to trial, the jury heard evidence linking Defendant and the Avondale house with a larger drug trafficking conspiracy headed by Curtis Pitter. The evidence showed that the conspirators would regularly drive or ride the bus from Kansas City, Missouri, to Phoenix, Arizona, carrying cash. They would then purchase marijuana, package it so as to reduce the smell, and ship it by UPS ground to Kansas City and sometimes other destinations. They would then fly back to Kansas City and repeat the process. The jury convicted Defendant of the charged conspiracy. The district court then sentenced him to 67 months' imprisonment after reducing his sentence from 121 months to reflect the 54 months he had served in Arizona based on the same conduct. See U.S.S.G. § 5G1.3(b)(1).

## II.

We turn first to the suppression issue. The Fourth Amendment requires search warrants to be supported by probable cause. U.S. Const. amend. IV. Probable cause requires a "fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). When reviewing a suppression motion, we ordinarily review the district court's legal conclusions de novo. See United States v. Vazquez, 555 F.3d 923, 927 (10th Cir. 2009). But when the motion

- 4 -

to dismiss alleges a search warrant lacked probable cause, we are not merely reviewing the district court's decision, but also the decision of the magistrate that issued the warrant. See United States v. Soderstrand, 412 F.3d 1146, 1152 (10th Cir. 2005). "A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" Gates, 462 U.S. at 236 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)). Thus, our standard of review for a magistrate's determination that a warrant should issue is whether the magistrate had "a substantial basis for concluding that a search would uncover evidence of wrongdoing." Id. (internal quotation marks, ellipsis, and alteration omitted).

Defendant argues no probable cause existed to search the Avondale house for three reasons. First, the odor of marijuana came only from the attached garage, not from the home itself. Second, the van that Curtis Pitter drove out of the garage took the smell of marijuana with it. And, third, the officers did not recheck the house after the van left to see if it still smelled of marijuana.

Defendant's first argument rests on two faulty premises. First, he asserts that, based on the affidavit's description, "the commissioner should have concluded the marijuana was in the garage, not the house." Appellant's Br. At 17. Defendant recognizes that we "may consider *only* information brought to the magistrate's attention." Aguilar v. Texas, 378 U.S. 108, 109 n.1 (1964), overruled on other grounds by Gates, 462 U.S. at 238. So we may not consider the testimony at the suppression hearing indicating that the smell came primarily from the garage. Yet Defendant believes the magistrate should have reached that conclusion based on the affidavit's statement that the

officers first smelled marijuana while they were in the driveway. But this fact does nothing to connect the smell to the garage, as opposed to the house. So this premise of Defendant's argument is faulty.

Next, Defendant assumes that the presence of marijuana in an attached garage is an insufficient basis to search the adjacent residence. Probable cause requires a "fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238. The strong smell of marijuana coming from the garage plus the existence of drug trafficking supplies in the van gave rise to a reasonable probability that evidence of a drug trafficking crime could be found in the house, as well as the garage. So Defendant's first argument fails because it rests on erroneous premises.

Defendant's second and third arguments go hand in hand. Essentially, Defendant is arguing that once the van containing small amounts of marijuana left the garage, any probable cause to search the garage or house vanished. Thus, the police could only establish probable cause for a search warrant by approaching the house and smelling marijuana a second time. Defendant is mistaken on a number of levels. First, the odor coming from the garage was "strong," and the van only contained small pieces of marijuana. So the issuing magistrate reasonably could have concluded the van was not the sole source of the smell coming from the garage. Second, the packaging materials and marijuana leaves in the van were enough, independently, to justify a search of the house. The magistrate could reasonably infer that the both the garage and the house contained additional evidence of drug trafficking. See United States v. Sanchez, 555 F.3d 910, 914 (10th Cir. 2009) ("[W]e think it merely common sense that a drug supplier

will keep evidence of his crimes at his home."). So the officers did not need to approach the house again to see if it still smelled of marijuana. Probable cause supported the warrant.[1]

III.

Defendant next argues the evidence at trial varied from the indictment, which alleged a conspiracy lasting from May 2000 to December 2009. "A variance arises when the evidence adduced at trial establishes facts different from those alleged in an indictment." United States v. Acosta-Gallardo, 656 F.3d 1109, 1116 (10th Cir. 2011) (quoting United States v. Ailsworth, 138 F.3d 843, 848 (10th Cir. 1998)). We review de novo whether a variance occurred, viewing the evidence and drawing reasonable inferences in the Government's favor. Id. A variance is only reversible error if it "affects the substantial rights of the accused." Id. (quoting Ailsworth, 138 F.3d at 848).

The Superseding Indictment alleged the following:

> From in or about May, 2000 . . . and continuing to on or about November 4, 2009, both dates being approximate and inclusive in the District of Kansas and elsewhere, the defendants [names of nineteen persons, including

---

[1] The Supreme Court recently held that using a drug-sniffing dog on a homeowner's front porch was a search within the meaning of the Fourth Amendment. Florida v. Jardines, --- S. Ct. ---, 2013 WL 1196577 at *7 (2013). But Jardines does not affect the outcome here because Officer Sayles smelled marijuana in this case before officers even called out the drug dog. According to the Jardines concurrence, "If officers can smell drugs coming from a house, they can use that information; a human sniff is not a search, we can all agree." Id. at *8 n.2 (Kagan, J., concurring). The search warrant application also informed the magistrate that a vehicle carrying packaging material covered with bits of marijuana had left the attached garage. So the warrant was supported by probable cause apart from the dog sniff. See United States v. Sims, 428 F.3d 945, 954 (10th Cir. 2005) ("When a warrant is tainted by some unconstitutionally obtained information, we nonetheless uphold the warrant if there was probable cause absent that information.").

Defendant] knowingly, and intentionally combined, conspired, confederated, and agreed together . . . to intentionally distribute and possess with intent to distribute 1000 kilograms or more of a mixture and substance containing marijuana, a controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(vii).

ROA, vol. I at 76–77. Defendant argues, "It is a factual and legal impossibility for [Defendant] to have participated in a conspiracy that extended nearly three years after he was arrested." Appellant's Br. at 23.

Our precedent, however, leaves no room for this argument. Each member of a conspiracy is legally responsible for the crimes of his fellow conspirators "until the conspiracy accomplishes its goals or that conspirator withdraws." United States v. Randall, 661 F.3d 1291, 1294 (10th Cir. 2011) (quoting United States v. Brewer, 983 F.2d 181, 185 (10th Cir. 1993)). "In order to withdraw from a conspiracy an individual must take affirmative action, either by reporting to the authorities or by communicating his intentions to the coconspirators." Id. (quoting United States v. Powell, 982 F.2d 1422, 1435 (10th Cir. 1992)). Defendant has introduced no evidence suggesting he withdrew from the conspiracy upon his arrest in 2007. He tries to reverse the burden of proof, arguing that "the government presented no evidence that [Defendant] participated in the conspiracy after his arrest." Appellant's Br. at 28. But the defendant bears the burden of proving a variance occurred.[2] United States v. Sells, 477 F.3d 1226, 1237 (10th Cir. 2007). Because he has not pointed to any affirmative acts by which he

---

[2] Defendant would also bear the burden of proving his withdrawal if he had invoked it as an affirmative defense. Smith v. United States, 133 S. Ct. 714, 720 (2013).

withdrew from the conspiracy, the law treats him as a member of the conspiracy even after his arrest.

Finally, even if Defendant could show a variance, the variance would not prejudice him. We have recognized a variance may cause prejudice when the defendant could not have anticipated from the indictment what the evidence would be at trial, United States v. Stoner, 98 F.3d 527, 536 (10th Cir. 1996), or when the jury is more likely than not to impute evidence related to separate conspiracies to the defendant, United States v. Windrix, 405 F.3d 1146, 1154 (10th Cir. 2005). Defendant makes neither of those arguments here. In fact, when he addresses prejudice in his reply brief, he simply falls back on his argument that the evidence was insufficient to show his participation in the conspiracy through 2009. But the indictment put him on adequate notice of the facts to be introduced at trial. And those facts proved the existence of a large-scale conspiracy, as well as Defendant's participation in it. Thus, even if a variance had occurred, it would not have been prejudicial.

IV.

Defendant's final argument is that the Government violated the Interstate Agreement on Detainers (IAD), which "establish[es] procedures for resolution of one State's outstanding charges against a prisoner of another State."[3] New York v. Hill, 528 U.S. 110, 111 (2000). The federal government, forty-eight states, and the District of

---

[3] A detainer is "a legal order that requires a State in which an individual is currently imprisoned to hold that individual when he has finished serving his sentence so that he may be tried by a different State for a different crime." Alabama v. Bozeman, 533 U.S. 146, 148 (2001).

- 9 -

Columbia have entered into the Agreement. Alabama v. Bozeman, 533 U.S. 146, 148 (2001). "The Agreement provides for expeditious delivery of the prisoner to the receiving State for trial prior to the termination of his sentence in the sending State." Id. When a detainer is lodged against a prisoner, the warden or another prison official must "promptly inform [the prisoner] of the source and contents of any detainer lodged against him and shall also inform him of his right to make a request for final disposition" of the charges. 18 U.S.C. App. 2 § 2, Art. III(c). If a prisoner requests a "final disposition" of the detainer charges, he has a right to be brought to trial within 180 days of that request. Id. Art. III(a). Even if he does not request a final disposition, the receiving state must begin the prisoner's trial "within one hundred and twenty days of the arrival of the prisoner in the receiving State, but for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction over the matter may grant any necessary or reasonable continuance." Id. Art. IV(c).

Here, Defendant was serving time in Arizona state prison when the United States District Court for the District of Kansas entered a writ of habeas corpus *ad prosequendum* against him. Defendant arrived in the District of Kansas in January 2010, but he did not go to trial until April 2011, more than fourteen months later. He argues the Government violated the IAD in two ways. First, he says, "[W]hen the Writ of Habeas Corpus Ad Prosequendum was served upon [Defendant], he was not informed of his right to demand trial within 180 days of service of the Writ." Appellant's Br. at 31. Second, he argues the Government violated the IAD by failing to bring him to trial within 120 days of his arrival in Kansas. Defendant never raised the IAD in the district court, so our review is

only for plain error. Fed. R. Crim. P. 52(b). See also United States v. Gomez, 67 F.3d 1515, 1521 (10th Cir. 1995).

The Government first argues the IAD does not apply because no evidence shows that the Government lodged a detainer against Defendant. The Supreme Court has said that "a writ of habeas corpus *ad prosequendum* is not a detainer for purposes of the Agreement." United States v. Mauro, 436 U.S. 340, 361 (1978). See also Greathouse v. United States, 655 F.2d 1032, 1033–34 (10th Cir. 1981) ("If no detainer was lodged with Missouri authorities prior to appellant's various transfers to Kansas by way of writs of habeas corpus ad prosequendum, there was no violation of the IADA."). The Government apparently *did* lodge detainers against two of Defendant's co-defendants based on the charges at issue here. An Arizona corrections officer testified at the sentencing hearing that both Ibrahima Kane and Defendant's brother Samora McIntosh had "detainer[s] to the U.S. Marshal's Office" as well as to Immigration and Customs Enforcement (ICE). Doc. 1384 at 2883, 2888.[4] Regarding Defendant, the corrections officer testified only that he had an "ICE detainer," id. at 2878, which likely would not have been based on the drug charges at issue here. Although we find it odd that the Government would lodge detainers against only two of the five defendants arrested in the Avondale house, the record does not clearly demonstrate that Defendant ever had a detainer lodged against him. Defendant bears the burden of showing a plain error, and he

---

[4] Defendant did not include this portion of the transcripts in the record he filed on appeal, but we may consider the transcripts filed on the district court docket because they are part of the record. Fed. R. App. P. 10(a)(2).

cannot show a violation of his IAD rights if he cannot even establish that the IAD applies.

Even if the IAD applies, Defendant's claim that he did not receive the notice required by the IAD fails for two reasons. First, he only asserts the prison officials failed to inform him of his IAD rights when they served him the writ of habeas corpus *ad prosequendum*. As we just established, however, the IAD does not apply to such writs. So this factual assertion is simply irrelevant. Second, the argument would fail even if we interpreted this argument as actually referring to a detainer, instead of a writ. The record does not show the Government ever lodged a detainer against Defendant, much less that prison officials failed to comply with the IAD's notice requirements. On plain error review, Defendant bears the burden of demonstrating an IAD violation. United States v. Dominguez-Benitez, 542 U.S. 74, 82 (2004). But he has not identified enough evidence to carry his burden on this claim.

Defendant's second IAD argument is that he was not brought to trial within 120 days after his arrival in the District of Kansas. The Government asserts that he waived this argument. A defendant may, indeed, waive his IAD rights by agreeing to a trial date that is later than the IAD requires. Hill, 528 U.S. at 118 (concluding that "defense counsel's agreement to the trial date" was enough to waive the Agreement's time limits). See also United States v. Dowdell, 595 F.3d 50, 64 (1st Cir. 2010). Here, the Government moved to designate the case a complex case and to exclude all time prior to trial for purposes of the Speedy Trial Act. The Government's motion requested a trial date of October 24, 2010, which was well beyond the IAD's 120-day deadline. At a

hearing on that motion, Defendant was present with his counsel. The district court asked if any of the defendants present objected to the case being designated as complex. Defendant did not object.

Defendant claims he had good reason not to object. He says the Government filed its motion to designate the prosecution a complex case three weeks before Defendant's arraignment in federal court. And the district court's hearing on the motion took place only ten days after his initial appearance and four days after his arraignment. Thus, Defendant says, he "had no meaningful opportunity to oppose the government's motion." Appellant's Br. at 32. Because he was present with his counsel at the hearing on the motion, however, he cannot claim he had no opportunity to object. He could have objected to the trial date or at least requested a continuance. Because he did not do so, he waived his right under the IAD to go to trial within 120 days.[5]

AFFIRMED.

Entered for the Court,


Bobby R. Baldock
United States Circuit Judge

---

[5] Because we hold that Defendant waived the Agreement, we need not address the Government's argument that Defendant tolled the statute of limitations by filing multiple pretrial motions.