KAUTZ, Justice.
[¶1] Joshua Lee Pier pled guilty to felony possession of anabolic steroids found in a search of his vehicle, subject to the right to appeal the denial of his motion to suppress the drugs found in his vehicle. We affirm.
ISSUES
[¶2] Mr. Pier presents four issues on appeal:
I. The peace officer lacked probable cause to stop the Defendant.
II. The peace officer lacked subsequent reasonable suspicion to detain.
III. The canine drug sniff while inside Mr. Pier's [v]ehicle constituted an illegal search and seizure due to illegal dog sniff.
IV. The peace officer did not have additional probable cause to search absent the illegal dog sniff.
*567 FACTS
A. Traffic Stop and Vehicle Search
[¶3] On September 6, 2016, at around 2:45 p.m., Deputy Derrick Colling of the Albany County Sheriff's Office was on patrol in Laramie, Wyoming. He was traveling south on 3rd Street when he observed an oncoming truck with a basketball-sized crack in the windshield, covering about a quarter of the passenger side, just to the right of center. Because Deputy Colling believed the crack obstructed the driver's view and was thus a traffic violation, he made a U-turn with the intention of stopping the truck.
[¶4] Before Deputy Colling activated his overhead lights, the truck turned left at Clark Street and onto a bridge over the railroad tracks. Deputy Colling waited through a red light at the intersection and then turned onto the bridge and saw the truck turn left off Clark Street onto Cedar Street. As Deputy Colling caught up to the truck, it signaled briefly and pulled abruptly to the right curb. Deputy Colling then activated his overhead lights and initiated a traffic stop.
[¶5] Deputy Colling approached the truck and asked for the driver's identification, and learned that he was Joshua Pier. Deputy Colling described his initial interactions and observations when he spoke to Mr. Pier.
Q. So what did you say to the-to Mr. Pier when you approached his vehicle?
A. Well, first off, before I ever said anything, he looked at me and he said, "What's going on, man?" very abruptly. After that, I told him the reason for the stop. I told him that I stopped him for-for having the broken windshield and for not signaling for 100 feet before pulling over.
Q. When you first spoke with Mr. Pier, did you notice anything about his demeanor?
A. Yes. He was extremely nervous.
Q. And how could you tell he was extremely nervous?
A. His hands were visibly shaking. He was very, very erratic with his movement. He was very fidgety with his hands, fidgety with his legs. He had his leg kind of propped up, his right leg kind of propped up in a very awkward-in a very awkward manner.
Q. Did you know-did you notice anything behind that leg?
A. Yes, I did.
Q. What was that?
A. I saw a-a black pouch. It was about the size of a fist and it was-it was kind of like a shaving kit looking sort of pouch. And it appeared to me that he was attempting to conceal that pouch behind his right leg.
Q. How did your interaction with Mr. Pier go on after you told him that you had-why you pulled him over?
A. I asked him for his information, for his driver's license, registration, proof of insurance. He reached into his glove box and pulled out a large stack of papers, set those papers on his lap, and for-for several seconds, he shifted through those papers and I could-I could-I could see his hands shaking while he was sorting through the papers as well.
Q. And what happened after that? Was he able to find all of the documentation?
A. I know that he found his driver's license. I believe he found [the] registration. I'm not sure about insurance. But he handed me the documents and I went back to my vehicle.
[¶6] When Deputy Colling returned to his vehicle, he conducted a records check and found out Mr. Pier's license was valid and that he had no outstanding warrants or anything else of note. As he was completing the records check, he recalled information he had learned months earlier about Mr. Pier.
A. Well, after seeing-after seeing his name, I realized that this was an individual that had some previous history and-and I had heard previous-I had heard information about his previous history being drug convictions.
Q. Where did you hear about this information?
A. From other deputies in the sheriff's office.
Q. When were you talking to the other deputies about Mr. Pier?
*568 A. It was a few months prior.
Q. What did you learn specifically about Mr. Pier?
A. Specifically, I learned that he had prior drug convictions for distributing methamphetamine. I learned that he had served time in the Wyoming state prison and was a very prolific gang member in the prison. I also learned that he was out of prison and was suspected of currently selling drugs.
Q. And to be clear, those were just suspicions?
A. That's correct.
Q. Did you personally do any investigating of Mr. Pier prior to this day?
A. I had a citizen source that I spoke with a few months prior to the stop as well, and this person told me that Mr. Pier was also actively selling drugs in Albany County.
[¶7] Deputy Colling began preparing a citation for the cracked windshield, and because he needed Mr. Pier's contact information to complete it, he returned to Mr. Pier's vehicle. On his return, Deputy Colling saw that the black pouch that had been behind Mr. Pier's right leg was no longer there, which further raised his suspicions.
Q. What was suspicious to you about this black bag?
A. Well, I've been in this line of work for 12 years and I've seen thousands of drug cases. It's very common that people who carry drugs, use drugs, sell drugs, possess drugs in sort of fashion use a small-a small kind of pouch, and it's their-it's their drug kit, so to speak.
Q. Was that your suspicion on that day?
A. Yes, it was.
Q. Okay. Was it buoyed by the fact of your prior knowledge of Mr. Pier's past?
A. Yes.
[¶8] Deputy Colling proceeded to ask Mr. Pier for his contact information so he could complete the citation. He "really stuttered over his words" when he gave Deputy Colling his address and then inverted the numbers when he repeated his address. He did the same thing with his telephone number, which caused Deputy Colling to believe that he was trying to conceal where he lived. Deputy Colling then asked Mr. Pier where he was coming from and where he was headed. His responses caught Deputy Colling's attention because his destination was a mile or more away from where he pulled over. Deputy Colling then asked Mr. Pier why he had pulled over on Cedar Street. He stated that he stopped in front of the house to see a friend or someone who lived there, but when Deputy Colling asked who lived in the house, he could not provide a name and just stated, "I don't know." Deputy Colling then asked Mr. Pier if he had any weapons in the vehicle, to which he responded that he had some knives.
[¶9] After this second contact, Deputy Colling decided to detain Mr. Pier and request that a K-9 unit be dispatched to his location. He explained his decision:
Q. And why did you have Mr. Pier step out of the vehicle?
A. Well, it was really the totality of the circumstances. He-he pulled over very abruptly without being signaled. His intent look into the mirror. His-without me even talking to him, he asked me what was going on and continually asked me what was going on during the stop. He was very paranoid, very fidgety with his hands, shaking like a leaf, so to speak. It appeared he was trying to conceal that black bag initially with his leg, and then the second time I approached him, the black bag was gone. He had prior convictions for-for drug-for drugs, and I had prior information that he was actively selling drugs. It was just a very, very, very strange situation. He had lied about his-about his address, about his phone number, and didn't really have a legitimate reason for stopping where he was. So it was just a very strange thing. I thought there was some kind of crime afoot.
[¶10] When Mr. Pier exited his vehicle, he left his door open and Deputy Colling was able to see that the black pouch had been tucked underneath the truck's center console. Deputy Colling directed Mr. Pier toward the front of his patrol vehicle, conducted a pat-down *569 of his person, and then called for a K-9 unit. Deputy Colling described what occurred during the time they waited for the K-9 unit.
Q. * * * Particularly what happened while you were waiting with Mr. Pier for the K9 unit to get there?
A. When Mr. Pier opened his door, when I asked him to exit the vehicle, he left his door open. And that would be the driver side door of his [pickup] truck. I directed him back to the front of my vehicle and again, like I said, conducted the pat down. During those several minutes that we were waiting for the-for the dog to come, Mr. Pier became very angry that his door was open and he ordered me to shut his door. I told him that I was not going to shut his door.
I also walked towards his vehicle and Mr. Pier again became very angry. He told me that I didn't have permission to search his vehicle, and I told him I wasn't going to search his vehicle, and Mr. Pier started walking towards me, just kind of bowing out his arms, puffing out his chest, like he wanted to fight and again ordered me to shut the door. I told him I wasn't going to shut the door and I wasn't going to let him anywhere near the vehicle. Based on his actions and the fact that there were knives in the vehicle, I wasn't going to let him touch his vehicle nor shut his door.
[¶11] A Wyoming Highway Patrol K-9 unit reported to the scene about fifteen to twenty minutes after Deputy Colling called in his request. Trooper Aaron Kirlin was the handler and his K-9 was Frosty, a springer spaniel. Trooper Kirlin had Frosty on a leash approximately ten feet long, and began Frosty's exterior sniff at the back driver's side of Mr. Pier's truck. Deputy Colling described Frosty's actions during the exterior sniff.
Q. And how exactly did that go?
A. He led his dog around from the-from the driver's side, so he started at the back, the back driver's side of the truck. He led his dog towards the front of the vehicle. I saw Trooper Kirlin walk past the open door and directed [sic] Frosty towards the front quarter panel of the vehicle in front of the open door. Frosty stopped by the driver's side door that was already open. I saw Frosty sniff in the air and then Frosty jumped into the vehicle.
I'm not a K9 handler, but it appeared that Frosty stuck his nose right by that black bag and kind of stiffened up. Trooper Kirlin told me later that Frosty had alerted to the odor of a controlled substance.
[¶12] Based on Frosty's alert, Deputy Colling determined he had probable cause to believe controlled substances would be found in Mr. Pier's vehicle, and he searched it. He found approximately three grams of marijuana in plant form in the black pouch under the truck's center console. In another black pouch, Deputy Colling found fifty anabolic steroid tablets with a total weight of approximately five grams.
B. Proceedings Below
[¶13] On September 8, 2016, the State filed an information charging Mr. Pier with felony possession of marijuana, third or subsequent offense, and felony possession of anabolic steroids. Mr. Pier was arraigned and pled not guilty to the charges, and on December 19, 2016, he filed a motion to suppress the evidence obtained in the search of his vehicle.
[¶14] On March 30, 2017, the district court held a hearing on Mr. Pier's motion to suppress. Noting that the State bore the burden of proving the legality of the search, the court directed the State to put on its evidence first. The State offered the testimony of only one witness, Deputy Colling.[1] The court then heard argument on the motion and took the matter under advisement.
[¶15] On April 3, 2017, the district court issued an order denying Mr. Pier's motion to suppress. The court found that Frosty's leap into the vehicle during his exterior sniff was spontaneous and not in response to a command or encouragement by Trooper Kirlin.
*570 The court also found that because it was Mr. Pier, and not Trooper Kirlin, who opened and left open the vehicle's door, Trooper Kirlin did not facilitate Frosty's entry into the vehicle. For these reasons, the court concluded Frosty's alert did not violate the Fourth Amendment and provided probable cause for Deputy Colling's search. The court further concluded that even in the absence of Frosty's alert, Deputy Colling had probable cause to search the vehicle. It reasoned:
Additional probable cause came from the culmination of the information known to Deputy Colling at the time he asked Mr. Pier to exit the vehicle combined with Mr. Pier's extreme and aggressive dealings with Deputy Colling while awaiting the arrival of the K-9 unit. Mr. Pier was insistent, to the point of near-violence, on closing his vehicle door and not allowing Deputy Colling near the vehicle. The Court places no emphasis on Mr. Pier's constitutional right to deny a search, or even his desire to have his vehicle closed. However, Mr. Pier's extreme reactions are noteworthy and, under a totality of the circumstances, justified a search of the vehicle.
[¶16] The State and Mr. Pier reached a plea agreement. In exchange for the State's agreement to dismiss the felony marijuana possession charge and make a sentencing recommendation, Mr. Pier agreed to plead guilty to felony steroid possession, subject to his right to appeal the district court's suppression ruling. On May 31, 2017, the district court issued its order accepting Mr. Pier's conditional guilty plea, and on that same date the court entered its judgment, which sentenced Mr. Pier to the State-recommended prison term of eighteen to twenty-four months. Mr. Pier filed a timely notice of appeal to this Court.
STANDARD OF REVIEW
[¶17] When a defendant challenges a warrantless search, the State bears the burden of proving the legality of the search. Pena v. State , 2004 WY 115, ¶ 29, 98 P.3d 857, 870 (Wyo. 2004). We review the district court's suppression ruling as follows:
We review the district court's factual findings on a motion to suppress for clear error. We defer to those findings and view the evidence in the light most favorable to the prevailing party because the district court is in the best position to weigh the evidence, assess the credibility of witnesses, and make the necessary inferences, deductions, and conclusions. However, we review the ultimate determination regarding the constitutionality of a particular search or seizure de novo.
Clay v. State , 2016 WY 55, ¶ 14, 372 P.3d 195, 197 (Wyo. 2016) (quoting Allgier v. State , 2015 WY 137, ¶ 11, 358 P.3d 1271, 1275 (Wyo. 2015) ).
DISCUSSION
[¶18] Mr. Pier challenges the district court's suppression ruling on numerous fronts. He contends: (1) Deputy Colling's traffic stop was illegal; (2) Deputy Colling lacked reasonable suspicion to detain him; (3) Frosty's entry into the vehicle was illegal; and (4) Deputy Colling did not have probable cause to search his vehicle without Frosty's alert. For each of these claims, Mr. Pier asserts constitutional violations under both the Wyoming and the United States constitutions. Because most of these arguments were not presented to the district court in a clear manner and with cogent argument and authority, we begin our discussion by narrowing the questions we will address.
[¶19] "[A] conditional plea of guilty or nolo contendere, while providing a mechanism for appellate review, does not provide carte blanche permission for an appellant to present any and all arguments on appeal." Ward v. State , 2015 WY 10, ¶ 15, 341 P.3d 408, 411 (Wyo. 2015) (quoting Kunselman v. State , 2008 WY 85, ¶ 11, 188 P.3d 567, 569-70 (Wyo. 2008) ); see also, Tibbetts v. State , 2017 WY 9, ¶ 12, 388 P.3d 517, 520 (Wyo. 2017). An appellant "may only raise those issues on appeal which were clearly called to the attention of the district court" and were supported by "at least a minimum effort to present a cogent legal argument." Flood v. State , 2007 WY 167, ¶ 12, 169 P.3d 538, 543 (Wyo. 2007) (quotation marks and citations omitted). With respect to Wyoming constitutional arguments in particular, we have said:
*571 An appellant does not preserve a Wyoming constitutional argument for appeal by merely citing to the Wyoming Constitution in his motion to suppress without independent supporting analysis of why or how that constitution provides different or more extensive protections.
Phippen v. State , 2013 WY 30, ¶ 12, 297 P.3d 104, 108 (Wyo. 2013) (citing Flood , ¶ 12, 169 P.3d at 543 ).
[¶20] Mr. Pier's motion to suppress was a three-sentence document. The first two sentences asserted that Deputy Colling's traffic stop and search of Mr. Pier's vehicle, and Frosty's entry into the vehicle, violated both the Wyoming and United States constitutions. The third sentence informed the district court that additional authority would be presented at the suppression hearing. During the suppression hearing itself, Mr. Pier presented only two arguments: that Frosty's vehicle entry was illegal and that without Frosty's alert, Deputy Colling did not have probable cause to search his vehicle. Mr. Pier did not offer a separate state constitutional analysis, and he did not challenge the traffic stop or Deputy Colling's grounds for extending the traffic stop. Because Mr. Pier failed to present the district court with his arguments about probable cause for the stop or reasonable suspicion to continue his detention, we decline to consider those claims here. Similarly, we decline to consider Mr. Pier's argument about the Wyoming Constitution.[2]
Independent Probable Cause to Search
[¶21] The district court found that (1) the K-9's entry into Mr. Pier's car was not facilitated by law enforcement but was spontaneous, and (2) even without the K-9's actions Deputy Colling's search of the car was supported by probable cause. If probable cause supports the search independent from any actions or alerts of the K-9, the district court properly denied Mr. Pier's motion to suppress. Therefore, we will review Mr. Pier's fourth issue first.
[¶22] An automobile may be searched without a warrant when there is probable cause to believe it contains contraband or evidence of a crime. Phippen v. State , 2013 WY 30, ¶ 13, 297 P.3d 104, 108 (Wyo. 2013). Probable cause to search an automobile "is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence of a crime." Id.
[¶23] "[P]robable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief' ... that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required." Vassar v. State , 2004 WY 125, ¶ 17, 99 P.3d 987, 994 (Wyo. 2004) (quoting Texas v. Brown, 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), which quoted Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925) and Brinegar v. United States, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949) ).
[¶24] The totality of the circumstances here showed a fair probability that the bag, which Mr. Pier was hiding, and his truck contained contraband. The totality of the circumstances known to Deputy Colling were:
1. Mr. Pier pulled over and stopped abruptly, for no apparent reason.
2. Mr. Pier was extremely nervous, with shaking hands and legs.
3. He was very erratic with his movements, and fidgety.
*572 4. Mr. Pier was attempting to conceal a black bag under his right leg, holding his leg in an unnatural manner.
5. He moved the black bag under the center console when the deputy was not present.
6. The deputy recognized the bag as the type of pouch individuals often use to carry illegal drugs.
7. Mr. Pier's explanation of where he was going was inconsistent with his observed route.
8. Mr. Pier claimed he had pulled over at a friend's house, but could not identify that person.
9. Mr. Pier incorrectly reported both his address and phone number. Deputy Colling concluded that Mr. Pier was attempting to mislead him.
10. Mr. Pier became belligerent and aggressive in attempting to get Deputy Colling to shut his truck door.
11. Mr. Pier had prior drug convictions for distributing methamphetamine.
These circumstances warrant any reasonable person to believe that there probably was contraband in Mr. Pier's truck. Any reasonable person would consider these facts and conclude that Mr. Pier probably was hiding drugs or other contraband in his vehicle. Any magistrate reviewing these facts would be obliged to reach that conclusion and to issue a search warrant.
[¶25] Mr. Pier is the appellant in this case, and has the burden of demonstrating that the decision below was improper. He has provided no case where these circumstances were found to be insufficient to constitute probable cause. A reasonable consideration of the totality of the circumstances here leads to the conclusion that Mr. Pier probably was concealing contraband. The subsequent search, then, was reasonable.
[¶26] Other courts have found probable cause in somewhat similar circumstances. In United States v. McLaughlin , 571 F. App'x 147, 148 (3d Cir. 2014), the Third Circuit found probable cause to search a vehicle where the driver had been stopped for a traffic violation, had $940 in his pocket, attempted to reach a black bag in the back seat, struggled with officers, and had a criminal history of numerous drug and weapons arrests. The arresting officer's experience indicated that the cash in the driver's pocket likely had come from illegal drug activity.
[¶27] In United States v. Hicks , 190 F.Supp.3d 733, 744-45 (S.D. Ohio 2016), an officer's knowledge of a driver's criminal history for drug and weapons crimes, together with his observations of the driver and the interior of the vehicle established probable cause for a warrantless search of the car. At the initial traffic stop, the officer saw the defendant lean back in his seat, make movements toward his waist band, and then reach for the glove box. When the officer approached the car, he saw an open box of sandwich bags, an open container of beer and a digital scale with white residue. The officer's experience indicated that the bags and scale often were used in the drug trade.
[¶28] The Tenth Circuit found probable cause for a warrantless search of an automobile trunk and its contents in United States v. West , 219 F.3d 1171 (10th Cir. 2000). In West, the driver exhibited extreme nervousness, had a prior criminal record, had used air freshener in the car (which in the officer's experience was connected to covering up the odor of controlled substances), and the officer smelled what he believed to be the odor of methamphetamine. The combination of these factors established probable cause.
[¶29] The totality of the circumstances known to Deputy Colling met or exceeded the totality of the circumstances in each of these cases. We determine that the district court correctly found those circumstances established probable cause to search Mr. Pier's vehicle, even before the K-9 indicated there were drugs in the truck.
[¶30] Because probable cause independent of the K-9's actions supported Deputy Colling's search, it is unnecessary to consider the actions of the K-9. We affirm the district court's denial of Mr. Pier's motion to suppress.
DAVIS, Chief Justice, dissenting, in which FOX, Justice, joins.
[¶31] A warrantless search of an automobile is per se unreasonable, and on a motion *573 to suppress, the State bears the burden of proving that probable cause justified that search. Pena v. State , 2004 WY 115, ¶ 29, 98 P.3d 857, 870 (Wyo. 2004). I do not believe the State met that burden, and I therefore respectfully dissent.[3]
I. Totality of the Circumstances
[¶32] Probable cause to search an automobile "is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence of a crime." Phippen v. State , 2013 WY 30, ¶ 13, 297 P.3d 104, 108 (Wyo. 2013) (quoting McKenney v. State , 2007 WY 129, ¶ 8, 165 P.3d 96, 98 (Wyo. 2007) ). The district court based its probable cause determination on the factors it found supported Deputy Colling's reasonable suspicion to detain Mr. Pier, combined with the additional factor of Mr. Pier's belligerent and aggressive behavior in objecting to a search of his vehicle. The court summarized its findings in paragraphs 35, 36, and 46 of its decision.
35. At the time Deputy Colling made the decision to extend the traffic stop, the entirety of his actual observations were as follows:
a. Mr. Pier immediately had turned and pulled over his car, seemingly upon observing Deputy Colling's patrol vehicle, for no other apparent reason;
b. Mr. Pier repeatedly asked the deputy "what's going on";
c. Mr. Pier displayed signs of extreme nervousness, including fidgeting, trembling hands, and erratic body language;
d. Deputy Colling noticed a black zippered pouch on the front seat during his initial interaction but, in his later interactions with Mr. Pier, the black pouch was no longer in sight;
e. Mr. Pier was propping up his right leg as if trying to conceal the black pouch;
f. When Deputy Colling asked Mr. Pier what his address was, he hesitated and gave Deputy Colling two different addresses;
g. When Deputy Colling asked what his phone number was, he again hesitated and gave Deputy Colling two different phone numbers;
h. Mr. Pier was stopped nowhere near his professed destination; and
i. Mr. Pier told Deputy Colling he knew the person who lived at the home he was parked in front of and later told Deputy Colling he did not know who lived at the home.
36. In addition to these observations, Deputy Colling also had knowledge of Mr. Pier's prior criminal convictions for illegal controlled substances and gang association in prison from other law enforcement officers. Deputy Colling also was informed by a confidential informant that Mr. Pier was involved recently in distributing controlled substances.
* * *
46. Additional probable cause came from the culmination of the information known to Deputy Colling at the time he asked Mr. Pier to exit the vehicle combined with Mr. Pier's extreme and aggressive dealings with Deputy Colling while awaiting the arrival of the K-9 unit. Mr. Pier was insistent, to the point of near-violence, on closing his vehicle door and not allowing Deputy Colling near the vehicle. The Court places no emphasis on Mr. Pier's constitutional right to deny a search, or even his desire to have his vehicle door closed. However, Mr. Pier's extreme reactions are noteworthy and, under a totality of the circumstances, justified a search of the vehicle.
[¶33] In my view, the district court elevated reasonable suspicion to probable cause without a sufficient basis to do so. I will address each factor and the weight to which each is entitled, and then their totality.
*574 A. Mr. Pier's Belligerent and Aggressive Behavior
[¶34] Because it is the factor that in the district court's view caused reasonable suspicion to ripen into probable cause, I begin with Mr. Pier's behavior in objecting to a search of his vehicle and demanding that Deputy Colling close the vehicle's door. Because I believe Mr. Pier had a right to object to the search of his vehicle, even vehemently, belligerently, and aggressively, I would attach no weight to this factor.
[¶35] This Court has recognized that an individual's assertion of his right to withhold consent to search cannot play any part in a probable cause analysis. Dimino v. State , 2012 WY 131, ¶ 13, 286 P.3d 739, 743 (Wyo. 2012) (quoting Damato v. State , 2003 WY 13, ¶ 19, 64 P.3d 700, 708 (Wyo. 2003) ). Although the district court purported to place no emphasis on Mr. Pier's assertion of his right to withhold consent and to instead factor in only the suspicion created by his extreme reactions, I see this as a distinction without a difference. Whether the court was giving weight to the refusal to consent itself, or to Mr. Pier's belligerent behavior in asserting that right, the court's focus was the same: if Mr. Pier has nothing to hide, he should not be concerned with law enforcement searching his vehicle. This premise has no place in a probable cause analysis.[4]
[¶36] Other courts have concluded likewise. In State v. Kern , 831 N.W.2d 149 (Iowa 2013), officers conducting a child welfare check asserted that the homeowner "purposely stood between them and the interior of the home to prevent them from entering further into the home." Id. at 156. The State argued this gave the officers reason to believe drugs would be found in the home and probable cause to search. Id . at 157. The Iowa Supreme Court disagreed.
Furthermore, neither the invocation of constitutional rights nor the refusal to grant consent to an officer to perform a search can be used alone to support either reasonable suspicion or probable cause. See State v. Maddox , 670 N.W.2d 168, 173 (Iowa 2003). In the words of the 10th Circuit:
Any other rule would make a mockery of the reasonable suspicion and probable cause requirements, as well as the consent doctrine. These legal principles would be considerably less effective if citizens' insistence that searches and seizures be conducted in conformity with constitutional norms could create the suspicion or cause that renders their consent unnecessary.
United States v. Hunnicutt , 135 F.3d 1345, 1351 (10th Cir.1998).
We agree. If such a refusal of consent or invocation of constitutional rights could supply officers with the requisite suspicion or cause to conduct a search, then citizens would be exposed to a dangerous catch-22 when officers request consent to conduct a search. If consent is given, the search occurs. If consent is refused, the officer may nevertheless conduct the search pursuant to the probable cause generated by the refusal. This is an unacceptable consequence under our constitutional framework.
We have similar doubts about the value of Grant's defensive posture as a factor in the probable cause determination.... [A] defensive posture by an occupant of a home in response to an intrusion by police is not indicative of probable cause of a crime. A homeowner may want personal matters within the privacy of the home protected from unwanted disclosure. The desire of a homeowner to keep police from entering beyond the threshold of the house during an unannounced visit is not probable cause the home contains evidence of a crime.
Kern , 831 N.W.2d at 175-76 (footnote omitted).
[¶37] The same holds true for defensive behavior in objecting to the search of a vehicle. In State v. Brown , 110 Or.App. 604, 825 P.2d 282 (1992), the defendant was a parolee whose home and vehicle were subject to *575 search if there existed reasonable grounds to believe such a search would disclose evidence of a parole violation. The defendant's parole officer conducted a home visit and observed a drug scale, baggies, a bullet, and a couple of knives on a table. Id. at 282. Based on that observation, the parole officer left and returned with a search team. Id . During the home search, the defendant grabbed a set of vehicle keys to keep them out of the officers' reach and became "excited and belligerent." Id . at 283. The officers handcuffed him, took the keys, and searched the defendant's vehicles, where they found stolen goods and drugs. Id .
[¶38] The defendant filed a motion to suppress any evidence obtained in the search of his vehicles, and the lower court denied that motion. Id. The appellate court reversed on the ground that a defendant's refusal to consent to a search cannot establish probable cause to search. Id. at 284-85. The court reasoned:
Allowing the police to conduct a search on the basis of the assertion of a privacy right would render the so-called right nugatory. This principle is equally valid, regardless of whether probable cause, reasonable suspicion or "reasonable grounds" circumscribes the authority for invading the privacy interest. We see no meaningful distinction between State v. Gressel , [16 Or.App. 189, 517 P.2d 1225 (1974) ], State v. Evans , [26 Or.App. 883, 554 P.2d 1031 (1976) ], and this case. All we know is that defendant held onto at least one set of keys until the search team retrieved them by force and that defendant did not want his cars to be searched. Hascall testified that defendant tried to hide the keys and that he became "excited and belligerent." The trial court made no express or implied findings about that. See Ball v. Gladden , 250 Or. 485, 487, 443 P.2d 621 (1968). We lack the authority to make such findings. However, whether defendant tried to hide the keys or simply held onto them is irrelevant. Neither action could amount to more than a manifestation of his desire not to have his cars searched. Until defendant grabbed the keys, the officers had no independent basis to seize them and no reasonable grounds to search the car.
* * *
Because the officers did not have reasonable grounds to believe that the cars contained evidence of a parole violation, defendant's right to refuse consent to their search was the same as the right of any other citizen. Defendant's action in grabbing the keys and secreting them could be nothing more than a clumsy effort to assert his right to the privacy of his cars.
Brown , 825 P.2d at 285.
[¶39] Mr. Pier had a right to refuse consent to search his vehicle, and his manner of doing so is not a factor that contributes to a finding of probable cause. I would therefore attach no weight to this factor on which the district court seemingly hinged its ruling.
B. Mr. Pier's Nervousness and Responses to Questions
[¶40] Mr. Pier's nervousness, his inconsistent or unusual travel plans, and his inconsistent or inaccurate answers to Deputy Colling's questions are factors entitled to weight in the Court's probable cause analysis. In weighing them, however, I believe it is important to recognize that these are factors more common to a reasonable suspicion determination than to a probable cause analysis. See, e.g. , Dimino , ¶¶ 19-22, 286 P.3d at 744-45 ; Frazier v. State , 2010 WY 107, ¶ 22, 236 P.3d 295, 302 (Wyo. 2010) ; Flood v. State , 2007 WY 167, ¶ 35, 169 P.3d 538, 548 (Wyo. 2007) ; Damato , ¶¶ 19-24, 64 P.3d at 708-10. That means where we usually see these factors having relevance is in the application of a standard less stringent than probable cause. Dimino , ¶ 18, 286 P.3d at 744.
Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.
Damato , ¶ 18, 64 P.3d at 707-08 (quoting United States v. Tuter , 240 F.3d 1292, 1296 n.2 (10th Cir. 2001) ).
*576 [¶41] Thus, while these factors are relevant, I would limit the weight they are given. Mr. Pier's nervousness and odd responses to Deputy Colling's questions are suspicious, but they are not as reliable as the type of information considered in a probable cause analysis. See, e.g. , Phippen , ¶ 15, 297 P.3d at 109 (odor of contraband); Tucker v. State , 2009 WY 107, ¶ 26, 214 P.3d 236, 244 (Wyo. 2009) (informant tip corroborated by DCI-recorded conversation). Indeed, this Court has found close calls even when considering nervousness and inconsistent answers in the less rigorous reasonable suspicion standard.
Although we acknowledge the evidence here is not overwhelming, the factors, including: the strong odor of a potential masking agent; the nervousness of the travelers; the inconsistency in the travelers' accounts of their trip and their relationship to one another and the boy; and the short turnaround time suggested nefarious, rather than innocent, conduct. We conclude, therefore, the totality of the circumstances established a reasonable suspicion to support further detention of Mr. Flood.
Flood , ¶ 35, 169 P.3d at 548 ; see also State v. Welch , 873 P.2d 601, 610 (Wyo. 1994) (Cardine, J., dissenting) (disagreeing that reasonable suspicion could be found where patrolman observed "a pickup with camper and net tailgate, a clove of garlic, a radar detector, a clean bed, the pickup was from San Diego, California, with a driver too nervous and a passenger too calm (asleep in the pickup bed)").
C. Mr. Pier's Criminal History
[¶42] Deputy Colling testified that a few months prior to his stop of Mr. Pier, he learned in talking with other deputies that he had prior drug convictions for distributing methamphetamine, that he had served time in a Wyoming state prison, and "was a very prolific gang member in the prison."[5] As to Mr. Pier's gang affiliation in prison, Deputy Colling provided no testimony as to the dates of Mr. Pier's incarceration, what gang he allegedly joined, whether the gang has been linked to criminal behavior, or whether Mr. Pier has any current affiliation with the gang. I would therefore attach no weight to Mr. Pier's alleged gang membership.
[¶43] As to Mr. Pier's criminal history, I agree it is a relevant factor, but it is also important to heed the Tenth Circuit's admonition that a criminal history may not be used to circumvent an individual's right to be free from unreasonable warrantless searches.
"[I]n conjunction with other factors, criminal history contributes powerfully to the reasonable suspicion calculus ." [United States v. ] White , 584 F.3d [935] at 951 [ (10th Cir. 2009) ] (quoting [United States v. ] Santos , 403 F.3d [1120] at 1132 [ (10th Cir. 2005) ] ) (emphasis in original). Although a person with a criminal record could not be pulled over or detained based on the record itself, such a record is one factor that may justify further detention and that may cast a suspicious light on other seemingly innocent behavior. See Santos , 403 F.3d at 1132 ("To be sure, this Court has held that a prior criminal history is by itself insufficient to create reasonable suspicion. People with prior convictions retain Fourth Amendment rights; they are not roving targets for warrantless searches. But in conjunction with other factors, criminal history contributes powerfully to the reasonable suspicion calculus." (internal citations omitted) ). Here, Trooper Bowles's knowledge that Mr. Simpson had a previous criminal history involving drug transportation weighs heavily in favor of finding reasonable suspicion.
United States v. Simpson , 609 F.3d 1140, 1147 (10th Cir. 2010).
[¶44] Notably, Simpson cited the relevance of an individual's criminal history in a reasonable suspicion analysis, and even there emphasized that standing alone, it is insufficient to establish reasonable suspicion. In considering its relevance in a probable cause determination, our Court has likewise recognized it as a factor but has stressed that standing alone, it is not sufficient.
*577 Tucker, ¶ 26, 214 P.3d at 244. As a practical matter, the role of an individual's criminal history in a probable cause analysis will inevitably be limited because it will be dwarfed by other more specific and reliable information. For example, in Tucker , the defendant's criminal history was a factor noted, but the officers also had an informant tip with specific corroborated details as to the vehicle involved, the vehicle's occupants, the vehicle's location, and the types of drugs that would be found in the vehicle. Id. , ¶¶ 5-7, 214 P.3d at 239 ; see also Borgwardt v. State , 946 P.2d 805, 807 (Wyo. 1997) (finding probable cause to search vehicle based on corroborated report from informant, DCI investigation details, and criminal history).
[¶45] In my view, an individual's criminal history is more compelling in determining reasonable suspicion to detain and less important in our typical search for probable cause. I would therefore give consideration to Mr. Pier's criminal history, but I would not let it carry the analysis or be a controlling factor.
D. Informant Tip
[¶46] Deputy Colling testified that he had a citizen source with whom he had spoken a few months before he stopped Mr. Pier, and that source told him that Mr. Pier was actively selling drugs in Albany County. In evaluating the weight to be given an informant's tip, we have said:
Reliance upon an informant's tip is reasonable if the tip contains "sufficient 'indicia of reliability' " such as predicting another person's future behavior, relating to specific information showing the informant's knowledge of that person's affairs, and so long as the police can corroborate some portion of the tip.
Venegas v. State , 2012 WY 136, ¶ 9, 287 P.3d 746, 749 (Wyo. 2012) (citation omitted); see also Tucker, ¶ 26, 214 P.3d at 244 (relying on informant tip in probable cause analysis where agents heard recorded conversation corroborating information).
[¶47] The tip Deputy Colling testified to was months old, and it lacked any specific information concerning Mr. Pier. Moreover, Deputy Colling admitted on cross-examination that he had taken no steps to verify the reliability of his informant or the reliability of the informant's tip. I view this information as irrelevant and entitled to no weight in the Court's probable cause analysis.[6]
E. Mr. Pier's Furtive Actions
[¶48] The final factors to be given consideration are Mr. Pier's action in abruptly pulling to the curb, the presence of a black pouch in his vehicle, and his attempts to conceal that pouch. I will begin with the pouch and Mr. Pier's attempts to conceal it since in my view it is the more compelling factor.
[¶49] The State does not argue, and neither the majority nor the district court concluded, that the black pouch's incriminating character was so immediately apparent that it gave Deputy Colling probable cause to seize and search the pouch under the plain view doctrine. See Vassar v. State , 2004 WY 125, ¶¶ 18-19, 99 P.3d 987, 994-95 (Wyo. 2004) (wooden box's incriminating character was immediately apparent to officer and gave him probable cause to seize and search box). In fact, while Deputy Colling testified that in his experience people who use, carry, or sell drugs use a small pouch to carry their drugs, he agreed on cross-examination that the pouch he observed in Mr. Pier's vehicle was not the particular pouch he had seen before. In other words, the pouch itself was not distinctive and was no more than a container coupled with the unremarkable observation that persons who use or sell drugs often put them in a container.
[¶50] What makes the pouch a factor in the probable cause analysis is Mr. Pier's behavior in first holding his leg in front of the pouch and then moving the pouch under the center console.
[I]f the police see a person in possession of a highly suspicious object or some object that is not identifiable but which because of other circumstances is reasonably suspected *578 to be contraband, and then observe that person make an apparent attempt to conceal the object from police view, probable cause is then present.
2 Wayne L. LaFave, Search and Seizure § 3.6(d) (5th ed.) (Oct. 2017 update) (footnotes omitted).
[¶51] This inference of criminality that may be drawn from an individual's furtive actions comes, however, with a caveat.
The difficulty is that from the viewpoint of the observer, an innocent gesture can often be mistaken for a guilty movement. He must not only perceive the gesture accurately, he must also interpret it in accordance with the actor's true intent. But if words are not infrequently ambiguous, gestures are even more so. Many are wholly nonspecific, and can be assigned a meaning only in their context. Yet the observer may view that context quite otherwise from the actor; not only is his vantage point different, he may even have approached the scene with a preconceived notion-consciously or subconsciously-of what gestures he expected to see and what he expected them to mean. The potential for misunderstanding in such a situation is obvious.
Id. (quoting People v. Superior Court , 3 Cal.3d 807, 91 Cal.Rptr. 729, 478 P.2d 449 (1970) ).
[¶52] The cases cited by LaFave in support of this rule illustrate the caution with which it is applied. For example, in State v. Thompson , 842 So.2d 330 (La. 2003), officers acting on a tip had the defendant under surveillance and observed transactions where money was exchanged and items were taken from the defendant's vehicle in exchange for money. Id. at 333. As the officers approached the defendant, who was then outside his vehicle, he tossed what looked like a white napkin into the vehicle's open window. Id. at 334. In holding the officers had probable cause to search the vehicle, the Louisiana Supreme Court explained:
In the instant case, we find that when defendant discarded the napkin as the officers approached, the officers' reasonable suspicions ripened into probable cause. While the furtive reaction alone was certainly insufficient to provide legal justification for the search, when the act is considered together with other facts known to the officers, the officers had a particularized basis for associating the object with narcotics trafficking. * * * Before defendant's furtive reaction, the evidence shows that the police received a confidential tip that the defendant was selling large amounts of heroin. Indeed, all of the specific information provided to police, i.e., defendant's first name, type of vehicle he owned, and license plate number, proved to be accurate. During the course of the surveillance, police witnessed the defendant exit his residence with a "white object," place the object into his car, and shortly thereafter, engage in a quick hand to hand transaction where money was exchanged for the object. Officer Selby testified that he was later informed by back-up members of the task force that the person with whom the defendant made the transaction "ingested something or placed something into his mouth" before running from police. Lastly, at trial, Selby recounted that before entering defendant's vehicle, he looked inside and saw a "white" napkin lying on the floorboard, and that otherwise the vehicle was very clean and "free of any other debris or trash." We find the totality of the evidence easily supports that the officers had probable cause.
Thompson , 842 So.2d at 336-37 (footnote omitted and emphasis added); see also United States v. McGehee , 672 F.3d 860, 869-70 (10th Cir. 2012) (furtive behavior of kicking handgun under seat combined with high crime neighborhood, scent of PCP, and presence of PCP container gave officer probable cause to arrest); United States v. Gavilanas-Medrano , 479 Fed. Appx. 166, 172 (10th Cir. 2012) (finding probable cause to search vehicle based on reliable tip describing vehicle and reporting drug transportation, drug dog's change of behavior (without actual alert) on exterior sniff, delay in defendant pulling over, defendant's nervousness, and furtive movements of passenger).
[¶53] The upshot of the cases on which the LaFave-articulated rule is based is that the furtive conduct or movement is not sufficient by itself to create probable cause. The furtive *579 conduct must be accompanied by other information, and the cases illustrate the type of information contemplated. It must be concrete, specific, and current information that creates a reasonable belief that the defendant is engaged in criminal conduct.[7]
[¶54] A furtive gesture, even one of concealing an object, is once again not a factor that may form the foundation for a probable cause determination. In this case, Mr. Pier's furtive actions, whether that be the concealing of the pouch or the abrupt pulling of his vehicle to the curb, were not accompanied by the type of evidence required to give furtive gestures weight. This case is instead more like the situation addressed in *580 People v. Goessl , 186 Colo. 208, 526 P.2d 664 (1974). In Goessl , the following occurred:
Defendant was stopped for speeding after Police Officer Leonard determined he was traveling at 40 miles per hour in a 30 mile per hour zone. At this time, the officer had no reason to suspect that defendant had committed any other offense. When the defendant stopped his auto, he walked 'abruptly' back to the police car, and he appeared to be nervous according to the officer's testimony. On the officer's request, the defendant readily presented his operator's license. He reentered his vehicle and began to search in the glove compartment for the vehicle registration when the officer requested it. In the course of this search, defendant removed from the glove compartment a leather pouch and placed it behind him. The officer also observed in the glove compartment a brown wooden pipe which the defendant surrendered to the officer on request. The defendant twice refused to surrender the leather pouch to the officer who thereupon seized and searched it. It contained a single white pill, which later proved to be an amphetamine. Following this discovery, the officer radioed for assistance, and was shortly joined by a detective. The defendant was arrested, and thereafter a thorough search of the vehicle was conducted. It revealed a single marijuana cigarette, and a brown paper bag containing LSD tablets.
Goessl , 526 P.2d at 664-65.
[¶55] The Colorado Supreme Court rejected the state's argument that the pouch combined with the defendant's furtive actions gave the officer probable cause to search the defendant's vehicle.
The People further contend that the wooden pipe and leather pouch which were seen by the officer are sufficient to establish probable cause for the search. But neither the pipe, nor the pouch, are contraband. The fact that both items could be used in an unlawful manner does not negate the fact that the normal use of either item is lawful. It is well established that probable cause must stand on firmer ground than mere suspicion. In People v. Ware , 174 Colo. 419, 484 P.2d 103 (1971), this court ruled that a package of hashish wrapped in tin foil must be suppressed. The following rationale which we expressed in Ware is fully applicable here.
'... The People rely on the Officers' knowledge that dangerous drugs are often packaged in tinfoil. However, even if dangerous drugs are often packaged in tinfoil, so many other, legitimate items-such as foods or tobacco-are packaged in tinfoil that a tinfoil package is not a suspicious circumstance....'
Finally, the People argue that the furtive gestures of defendant in attempting to conceal the leather pouch from the view of the officer creates probable cause. Yet a mere furtive gesture is subject to such varied interpretations, that it would be folly to allow great weight to be afforded such actions without more specific knowledge on the part of the officer. Sibron v. New York , 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) ; People v. Superior Court of Yolo County , 3 Cal.3d 807, 91 Cal.Rptr. 729, 478 P.2d 449 (1970). Here, the officer testified that before stopping the defendant for speeding, he had never seen him before and had no information about him.
Goessl , 526 P.2d at 665.
[¶56] Deputy Colling likewise had no current, reliable, corroborated information concerning Mr. Pier that would implicate him in criminal conduct. Without that, Mr. Pier's furtive behavior was insufficient to establish probable cause to search his vehicle.
[¶57] When I consider the totality of the relevant circumstances in this case, I am left with no doubt that Deputy Colling had the required reasonable suspicion to detain Mr. Pier. Those suspicions, however, lacked the definition, specificity, and reliability required to rise to the level of probable cause.[8]
*581 [¶58] I understand and embrace this Court's rejection of "rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach" to probable cause. Phippen , ¶ 14, 297 P.3d at 108 (quoting Florida v. Harris , 568 U.S. 237, 133 S.Ct. 1050, 185 L.Ed.2d 61 (2013) ). That said, cases like Tucker and Borgwardt illustrate that while we do not demand certainty in a probable cause analysis, we do expect the information on which law enforcement relies to be current, or at least recent, and to have a heightened level of specificity and reliability. See also Gronski v. State , 910 P.2d 561, 562-63, 565 (Wyo. 1996) (finding probable cause to search vehicle based on reliable informant's corroborated report that defendant had eight pounds of marijuana in a green duffle bag in a blue Lincoln Continental).
[¶59] I also recognize that in evaluating the factors in a probable cause analysis, this Court must look to the totality of the circumstances, and not parse each individual factor in a divide-and-conquer approach to the analysis. Jennings v. State , 2016 WY 69, ¶ 14, 375 P.3d 788, 791-92 (Wyo. 2016). That said, I am unwilling to gloss over deficiencies in the information relied upon to find probable cause.
However, neither may a court arrive at probable cause simply by piling hunch upon hunch. Thus, in assessing the totality of the circumstances, a reviewing court "must examine the facts individually in their context to determine whether rational inferences can be drawn from them" that support a probable cause determination.
United States v. Valenzuela , 365 F.3d 892, 897 (10th Cir. 2004) (citing United States v. Martinez-Cigarroa , 44 F.3d 908, 911 (10th Cir. 1995) ).
[¶60] When I consider the circumstances in this case individually and in their totality, I must conclude the district court clearly erred *582 in finding probable cause to search Mr. Pier's vehicle.
II. Frosty's Entry into Mr. Pier's Vehicle
[¶61] The actions of Frosty the drug dog might supply probable cause for the search, and so I will deal with that issue. Although this Court has not had a prior opportunity to address the circumstances in which a drug dog's entry into a vehicle during an exterior sniff is permissible under the Fourth Amendment, several other jurisdictions have weighed in on the question. What has emerged is a generally accepted two-part test. I will begin my analysis with that test and its origin and then address the district court's findings and conclusions under the test.
A. Two-Part Fourth Amendment Test
[¶62] It is well established that an exterior canine sniff of a car during a lawful traffic stop is not a search under the Fourth Amendment. Illinois v. Caballes , 543 U.S. 405, 409, 125 S.Ct. 834, 838, 160 L.Ed.2d 842 (2005) ; see also Engdahl v. State , 2014 WY 76, ¶ 14, 327 P.3d 114, 118 (Wyo. 2014). If, however, a drug dog enters a vehicle during an exterior sniff, that entry may implicate Fourth Amendment concerns because "[p]eople have a reasonable expectation of privacy in the interior of their automobiles." United States v. Lujan , 398 Fed. Appx. 347, 350 (10th Cir. 2010) (quoting United States v. Stone , 866 F.2d 359, 363 (10th Cir. 1989) ). The Tenth Circuit Court of Appeals was the first court to address such a circumstance with its 1989 decision in Stone , and a number of other jurisdictions then followed suit. See, e.g. , United States v. Guidry , 817 F.3d 997, 1006 (7th Cir. 2016) ; United States v. Sharp , 689 F.3d 616, 620 (6th Cir. 2012) ; United States v. Mostowicz , 471 Fed. Appx. 887, 890-91 (11th Cir. 2012) ; United States v. Pierce , 622 F.3d 209, 213-14 (3rd Cir. 2010) ; United States v. Lyons , 486 F.3d 367, 373 (8th Cir. 2007) ; State v. Miller , 367 N.C. 702, 766 S.E.2d 289, 296 (2014) ; United States v. Hutchinson , 471 F.Supp.2d 497, 506 (M.D. Pa. 2007).
[¶63] In Stone , the defendant was stopped for speeding and denied the violation, insisting that he was being careful because he had already been cited that day for speeding. Stone , 866 F.2d at 361. When the officer asked to see the earlier ticket, the defendant opened his hatchback to retrieve it. Id . While the hatchback was still open, another officer arrived with a drug dog and began an exterior sniff of the vehicle. Id . The dog circled the vehicle, showed interest under the rear of the car and at the passenger door, and then jumped in the open hatchback and keyed on a duffle bag. Id . Upon searching the bag, officers found 33,000 methaqualone tablets. Id . The court acknowledged the expectation of privacy an individual has in his vehicle's interior but nonetheless upheld the search. Id. at 363-64. It explained:
We agree with the district judge that the dog's instinctive actions did not violate the Fourth Amendment. There is no evidence, nor does Stone contend, that the police asked Stone to open the hatchback so the dog could jump in. Nor is there any evidence the police handler encouraged the dog to jump in the car.... The judge asked the Officer in charge of the dog: "So you didn't encourage him or discourage him from jumping into the back?" And the Officer replied: "That's correct. I just let his leash go and let him go where his nose would take him." ... In these circumstances, we think the police remained within the range of activities they may permissibly engage in when they have reasonable suspicion to believe an automobile contains narcotics.
Stone , 866 F.2d at 364.
[¶64] Since Stone, the Tenth Circuit has further refined the test for determining the legality of a dog's entry into a vehicle during an exterior sniff and has upheld such sniffs when:
(1) the dog's leap into the car was instinctual rather than orchestrated and (2) the officers did not ask the driver to open the point of entry, such as a hatchback or window, used by the dog.
United States v. Vazquez , 555 F.3d 923, 930 (10th Cir. 2009) (citing Stone , 866 F.2d at 364 and United States v. Winningham , 140 F.3d 1328, 1330-31 (10th Cir. 1998) ); see also *583 United States v. Moore , 795 F.3d 1224, 1232 (10th Cir. 2015) ; Felders v. Malcom , 755 F.3d 870, 880 (10th Cir. 2014) ; United States v. Lujan , 398 Fed. Appx. 347, 350 (10th Cir. 2010).
[¶65] The two-part test is aimed at determining whether officers acted with an intent to facilitate an interior vehicle search. Winningham , 140 F.3d at 1331. This focus makes sense because "the Fourth Amendment addresses 'misuse of power,' * * * not the accidental effects of otherwise lawful government conduct." Brower v. Cty. of Inyo , 489 U.S. 593, 596, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989) (quoting Byars v. United States , 273 U.S. 28, 33, 47 S.Ct. 248, 250, 71 L.Ed. 520 (1927) ). As the North Carolina Supreme Court explained:
If a police dog is acting without assistance, facilitation, or other intentional action by its handler (in the words of Sharp, acting "instinctively"), it cannot be said that a State or governmental actor intends to do anything. In such a case, the dog is simply being a dog. If, however, police misconduct is present, or if the dog is acting at the direction or guidance of its handler, then it can be readily inferred from the dog's action that there is an intent to find something or to obtain information. See Winningham , 140 F.3d at 1330-31 (invalidating a search on such grounds).
Miller , 766 S.E.2d at 296.
B. District Court's Findings under the Two-Part Test
[¶66] The two-part test required the State to make two showings: (1) that Frosty's vehicle entry was instinctual rather than orchestrated; and (2) that the officers did not create the point of entry. Vazquez , 555 F.3d at 930. Because the vehicle's entry point was created before Trooper Kirlin and Frosty arrived at the traffic stop, I begin with the district court's ruling on the test's second prong. I will then address the district court's finding that Frosty's entry into the vehicle was instinctual.
1. Creation of Entry Point
[¶67] The district court found that Mr. Pier, not the officers, created the entry point into his truck.
42. ... Trooper Kirlin did not facilitate Frosty's sniff of the interior of Mr. Pier's vehicle by opening the door. The door to Mr. Pier's vehicle was open because Mr. Pier failed to shut it when Deputy Colling asked him to exit the vehicle.
[¶68] Mr. Pier claims the district court erred in this finding. First, he likens this case to Winningham , where the Tenth Circuit held that law enforcement's act of leaving a vehicle's door open until the drug dog arrived evidenced their intent to facilitate an interior dog sniff and therefore violated the Fourth Amendment. Winningham , 140 F.3d at 1331. Additionally, he contends that because Deputy Colling would not permit him to return to his vehicle to secure it and Deputy Colling refused to close the vehicle door himself, it was Deputy Colling who was responsible for creating the entry point. I disagree.[9]
[¶69] First, Winningham is factually different from this case. In Winningham , New Mexico border agents stopped a van on suspicion of carrying undocumented aliens. Winningham , 140 F.3d at 1329. One of the agents requested and was given consent to search the van for illegal passengers and opened the van's sliding door to conduct that search. Id . The search revealed no other passengers, and the agent then requested and was given consent to run a drug dog around the van's exterior. Id . When the canine unit arrived five or six minutes later, the handler began the exterior sniff with the dog leashed. Id . As they approached the rear of the van, however, the handler detected a "just noticeable" change in the dog's behavior and unleashed the dog. Id . at 1329-30. The dog then jumped into the van, methodically sniffed its interior, and eventually alerted on a rear vent where the agents found fifty kilograms of marijuana. Id . at 1330.
*584 [¶70] In holding the interior sniff violated the Fourth Amendment, the court observed:
In Mr. Winningham's case, the officers themselves opened the door, allowing the van to sit on the side of the highway with the sliding door wide open for a period of at least six minutes until the drug dog could arrive. The dog handler then unleashed the dog as the dog neared the open door. A desire to facilitate a dog sniff of the van's interior, absent in Stone, seems readily apparent here.
Winningham , 140 F.3d at 1331 (footnote omitted).
[¶71] In contrast to Winningham , in this case it was Mr. Pier who opened his vehicle door and left it open, not Deputy Colling. See Guidry , 817 F.3d at 1006 (distinguishing Winningham where defendant, not officers, opened door); United States v. Nance , 2010 WL 4004782, **20-21 (E.D. Tenn. 2010) (same); United States v. Woods , 2008 WL 11396770, *5 (D. Kan. 2008) (upholding search where defendant left door open and rejecting argument that officers created entry point by requiring defendant to exit vehicle). Additionally, Deputy Colling's refusal to allow Mr. Pier to return to his vehicle was a decision made for safety reasons, not to facilitate an interior search. Deputy Colling cited his concern with Mr. Pier's aggressive behavior and the presence of knives in the vehicle, and testified that "[b]ased on his actions, and the fact that there were knives in the vehicle, I wasn't going to let him touch his vehicle nor shut his door." That makes this case less like Winningham and more like Mostowicz , an Eleventh Circuit case where the court concluded:
Mostowicz contends that the officers facilitated [K-9] Cody's search when they handcuffed him before he had an opportunity to close his door. But nothing evidences that the officers instructed Mostowicz to leave open his door. And, as we have discussed, the officers handcuffed Mostowicz based on their reasonable belief that he was armed and dangerous, not to facilitate the dog sniff.
Mostowicz , 471 Fed. Appx. at 891.
[¶72] Finally, I reject Mr. Pier's argument that Deputy Colling was responsible for creating the entry point because he refused to close the door himself. An officer has no affirmative duty to close vehicle entry points in preparation for an exterior sniff. Sharp , 689 F.3d at 619 ; Lyons , 486 F.3d at 373. As the Eighth Circuit explained:
Appellants do not cite to any authority that holds that the officers had the affirmative duty to close the windows in preparation for the dog sniff, and we find none. Instead, appellants rely on United States v. Winningham , 140 F.3d 1328, 1329-30 (10th Cir. 1998) [.] .... Winningham does not help appellants here, as both Trooper Brehm and Sgt. Duis, in the words of the district court, "took the situation as [they] found it."
Lyons , 486 F.3d at 373.
[¶73] For these reasons, I would find no clear error in the district court's conclusion that Mr. Pier, not the officers, created the entry point through which Frosty accessed the interior of Mr. Pier's vehicle.
2. Dog's Entry of Vehicle
[¶74] As to the remaining prong of the two-part analysis, the requirement that a dog's vehicle entry during an exterior sniff be instinctual rather than law enforcement-orchestrated, the district court again concluded that the State met its burden of proof. Citing Deputy Colling's testimony, the court found that Frosty entered Mr. Pier's vehicle spontaneously and not at Trooper Kirlin's command or encouragement. Based on my record review, I must disagree. For reasons that are not apparent from the record, the State did not call Trooper Kirlin as a witness in the suppression hearing. For the reasons that follow, I believe this left a gap in the State's evidence that was not filled by Deputy Colling's testimony.[10] I would therefore *585 conclude that the district court clearly erred in ruling that the State met its burden of proof on this prong of the two-part test.
[¶75] A dog's vehicle entry is instinctual if the dog enters the vehicle "without assistance, facilitation, or other intentional action by its handler." Pierce , 622 F.3d at 214. The Sixth Circuit has summarized the required inquiry:
[W]hile it is a Fourth Amendment violation for a narcotics canine to be trained to jump into cars, it is not a Fourth Amendment violation for a dog to jump into a car on its own volition and instinct when sniffing for drugs, as long as the dog's behavior has not been facilitated by law enforcement. This inquiry focuses on the police's conduct in training the dog before the search and the officers' conduct during the search. It is a Fourth Amendment violation for a narcotics detection dog to jump into a car because of something the police did, like training the dog to jump into cars as part of the search or facilitating or encouraging the jump.
Sharp , 689 F.3d at 620.
[¶76] In addressing whether Frosty's entry into Mr. Pier's vehicle was instinctual as opposed to law enforcement-orchestrated, the district court found:
42. Here, Deputy Colling testified that he did not see Trooper Kirlin command or encourage Frosty to enter into the vehicle but, instead, led him around the vehicle to conduct a standard sniff of the vehicle. After Frosty spontaneously entered the vehicle, he alerted to the presence of a controlled substance.
[¶77] The record does not support this finding. First, Deputy Colling did not testify that he did not see Trooper Kirlin command or encourage Frosty to enter the vehicle. Deputy Colling testified:
[Trooper Kirlin] led his dog around from the-from the driver's side, so he started at the back, the back driver's side of the truck. He led his dog towards the front of the vehicle. I saw Trooper Kirlin walk past the open door and directed Frosty towards the front quarter panel of the vehicle in front of the open door. Frosty stopped by the driver's side door that was already open. I saw Frosty sniff in the air and then Frosty jumped into the vehicle.
I'm not a K9 handler, but it appeared that Frosty stuck his nose right by that black bag and kind of stiffened up. Trooper Kirlin told me later that Frosty had alerted to the odor of a controlled substance.
[¶78] Deputy Colling was not asked whether Trooper Kirlin commanded or encouraged Frosty to enter Mr. Pier's vehicle, and he did not volunteer any such testimony. His testimony was simply silent on that question. Moreover, on cross-examination, Deputy Colling was reluctant to commit to Trooper Kirlin's actions.
Q. * * * Now, did Trooper Kirlin, when he was walking the dog around there, he had the dog on the leash, correct?
A. Correct.
Q. He did try to pull the dog out of the truck when the dog jumped into the truck?
A. I don't know. You'd have to ask him.
Q. Okay. So you don't know, but he left the dog in there and the dog got all the way into the center of the pickup truck before it alerted, correct?
A. I couldn't tell you exactly at what point he alerted. I know that he locked up on the-on the center console of the vehicle.
* * *
Q. So how long was the drug sniff dog inside the vehicle?
A. A few seconds. I don't know exactly how long.
Q. Well, what were you doing when all this was happening? Were you observing Mr.-or Trooper Kirlin when he was running the dog.
A. Yes.
Q. You observed him, but you don't recall whether * * * Trooper Kirlin pulled the dog-tried to pull the dog out of the vehicle?
A. No. No. And I-to observe very minute body movements from another office[r] or another person in general is very difficult.
*586 Q. You observed all of the body movements from Mr. Pier, and you couldn't observe Officer-or Trooper Kirlin?
A. I don't recall him trying to pull the dog out of the vehicle.
[¶79] Deputy Colling's reservations are understandable. Courts, including this Court, have recognized that a drug dog's handler is uniquely qualified to interpret that dog's behaviors during a sniff. See Phippen , ¶ 16, 297 P.3d at 109 (recognizing drug dog may exhibit behaviors during sniff that will have meaning to handler but not to officer who lacks the same training and experience with the dog); United States v. Ludwig , 10 F.3d 1523, 1528 (10th Cir. 1993) (giving greater weight to handler testimony to resolve discrepancy between handler and non-handler testimony). As the Sixth Circuit observed:
[T]he primary issue in determining the credibility of a dog's alert is not the capability or ability of a dog to accurately identify particular scents, but is instead the communication between the handler and the dog based on that indisputable ability. This determination in turn rests almost entirely on the credibility of the dog handler's testimony because the handler is the only witness who can speak to the subjective interaction during a particular dog alert.
United States v. Howard , 621 F.3d 433, 449 (6th Cir. 2010), cert. denied , 562 U.S. 1278, 131 S.Ct. 1623, 179 L.Ed.2d 514 (2011) (internal quotation marks and citation to district court decision omitted); United States v. Christian , 452 Fed. Appx. 283, 286 (4th Cir. 2011) (per curiam) (quoting Howard , 621 F.3d at 449 ).[11]
[¶80] This brings me to the deficit I find in the evidence before the district court: Trooper Kirlin did not testify at the suppression hearing. The absence of handler testimony distinguishes this case from other cases addressing a dog's vehicle entry during an exterior sniff. In the great majority of cases I have reviewed, the courts expressly relied on handler testimony to determine whether the dog acted instinctively or was trained, encouraged, or guided to enter a vehicle. See United States v. Almeida , 2012 WL 75751, **10, 12 (D. Me. 2012) ; Guidry , 817 F.3d at 1002, 1006 ; Sharp , 689 F.3d at 620 ; Pierce , 622 F.3d at 210, 214 ; Lujan , 398 Fed. Appx. at 351 ; Vazquez , 555 F.3d at 930 ; Lyons , 486 F.3d at 373 ; Winningham , 140 F.3d at 1329-30, 1331 ; Stone , 866 F.2d at 364 ; Nance , 2010 WL 4004782, *21 ; Woods , 2008 WL 11396770, *5 ; Hutchinson , 471 F.Supp.2d at 510 n.10 ; State v. Warsaw , 125 N.M. 8, 956 P.2d 139, 142-43 (N.M. App. 1997). In these cases, the courts had sufficient evidence to determine whether the drug dog in question had been trained or encouraged in any manner to enter the vehicle. In this case, that evidence is entirely lacking.[12]
[¶81] I reiterate that I do not intend to suggest that the State may only prove the legality of this type of search with handler testimony. It may be that the State can make the required showing that a drug dog acted instinctively with other qualified evidence. In this case, however, Deputy Colling was by his own admission unable to interpret either Frosty's or Trooper Kirlin's actions, and the State offered no other evidence to aid in that *587 interpretation. Additionally, while this Court views the evidence in the light most favorable to the prevailing party, this does not give the Court leeway to interpret the actions of Trooper Kirlin and Frosty. The record does not tell us how Frosty was trained to respond to open vehicles, Frosty's past experience with open vehicles, how Trooper Kirlin handled Frosty on the leash, or the cues, if any, Trooper Kirlin may have given Frosty. Without that information, any meaning this Court may attach to the actions of Trooper Kirlin and Frosty would go beyond drawing favorable inferences from the evidence and amount to no more than speculation.
[¶82] Based on the lack of evidence explaining or interpreting the actions of Trooper Kirlin and Frosty, I would conclude that the district court clearly erred when it found the State had met its burden of proving the legality of Frosty's vehicle entry. I therefore dissent, and I would suppress the drugs seized during the search.

The record does not indicate whether the State intended to present the testimony of Trooper Kirlin. After Deputy Colling testified, the prosecutor requested and was granted a five-minute recess to contact someone. When court reconvened, however, the State rested without offering any additional evidence.

We have in the past expanded our analysis to include a state constitutional analysis when the district court has performed a state constitutional analysis despite the defendant's failure to adequately raise the claim. See, e.g. , Cotton v. State , 2005 WY 115, ¶ 15, 119 P.3d 931, 934 (Wyo. 2005). Here the district court cited Article 1, Section 4 of the Wyoming Constitution, but it did not separately analyze Frosty's vehicle entry or Deputy Colling's probable cause under the state provision. We, therefore, adhere to our usual practice and will not consider Mr. Pier's state claims.

I do not dissent from the majority's conclusion that Mr. Pier failed to preserve his state constitutional challenges or his challenges to the initial traffic stop and the reasonable suspicion required to extend that traffic stop.

Law enforcement is of course not required to ignore a detained individual's inappropriate behavior. If Mr. Pier's behavior had crossed the line from belligerence to disorderly conduct, violence, obstruction, or interference, we expect that Deputy Colling would have responded with appropriate charges.

The record shows that Mr. Pier's prior convictions were for marijuana distribution, not methamphetamine distribution.

I recognize that the majority opinion does not cite the informant's tip as a factor in its analysis, but Deputy Colling and the State cited it as a factor, and the district court gave it weight in its analysis.

See United States v. Johnson , 599 F.3d 339, 345-46 (4th Cir. 2010) (probable cause where officers witnessed transaction that appeared to be drug transaction and defendant tossed capsule when officers approached); United States v. McFarlane , 491 F.3d 53, 56-57 (1st Cir. 2007) (finding probable cause to arrest where officer saw defendant chasing victim, heard shots fired, and observed defendant try to hide firearm under garbage can liner); United States v. Sanders , 631 F.2d 1309, 1311-12 (8th Cir. 1980) (finding probable cause where officers had current and corroborated tip from reliable informant that defendant and another were currently trafficking in heroin and cocaine and defendant's passenger made furtive movement of his hand from shirt pocket to car floor when officers approached); State v. Graham , 130 Wash.2d 711, 927 P.2d 227, 234 (1996) (en banc) (finding probable cause where officers observed defendant carrying large amount of cash and packet containing what looked like rock cocaine and defendant attempted to conceal items in pocket, ignored officer requests to stop, was nervous, and was sweating profusely in cold weather); State v. Smith , 190 W.Va. 374, 438 S.E.2d 554, 560 (1993) (per curiam) (furtive gesture by vehicle occupant in placing object in purse not sufficient for probable cause but probable cause found when furtive gesture was combined with vehicle's location in high crime area and officers' detection of marijuana odor); Hovington v. State , 616 A.2d 829, 833-34 (Del. 1992) (probable cause to arrest upheld where defendant sitting with two suspects named in arrest warrant in high crime area ran from police and tried to conceal or dispose of packages); State v. Thomas , 240 Neb. 545, 483 N.W.2d 527, 537-38 (1992) (finding probable cause where officers had detailed and corroborated tip from informant including type of car, plate number, time of transaction, and one of occupants placed what appeared to be rock cocaine in mouth when stopped by officers); State v. Bumpus , 459 N.W.2d 619, 623-25 (Iowa 1990) (finding probable cause to arrest where defendant was in high crime area, crouched behind vehicle with others, passing something between them, and when officers approached defendant ran and tried to dispose of or conceal pouch); State v. Maguire , 129 N.H. 165, 523 A.2d 120, 121-23 (1987) (finding probable cause where officer entered restroom and observed defendant with cash in one hand and vial officer recognized as type used to carry drugs in other and defendant shoved items into pockets); State v. Ruffing , 127 N.H. 370, 499 A.2d 1351, 1352 (1985) (finding probable cause where officers responded to domestic call and observed bong, several hand-rolled cigarettes, and rolling papers, and defendant attempted to grind the cigarettes into carpet with booted foot); State v. Welch , 18 Ohio St.3d 88, 480 N.E.2d 384, 388 (1985) (finding probable cause where officers received numerous tips from informants, specific information from FBI that defendant would arrive in Cleveland to purchase a specified amount of cocaine at a given place and time and when officers stopped and approached vehicle, defendant took packages from clothing and threw to vehicle floor); Muniz v. State , 672 S.W.2d 804, 805-06 (Tex. Crim. App. 1984) (en banc) (finding probable cause to arrest where two males were in area of burglary, matched description of suspects, walked fast away from patrol car, dumped items from pockets, and gave odd response to officer questions); State v. Harris , 333 N.W.2d 873, 875-76 (Minn. 1983) (finding probable cause to arrest and seize ring where defendant suspected of burglary was stopped in vehicle where marijuana, a necklace, and bolt cutters were in plain view and defendant rotated ring on finger so setting could not be seen); Price v. United States , 429 A.2d 514, 518 (D.C. 1981) (finding probable cause to seize and search manila coin envelope where defendant's furtive movements were combined with high crime area and officer's experience in recognizing envelope as drug-related); State v. Burkman , 281 N.W.2d 436, 440 (S.D. 1979) (finding probable cause where medical building break-in was reported, defendant's car was found parked and running with lights off near building, defendant had no identification, gave evasive answers to questions, and pill bottle defendant tried to conceal was visible under bandana); People v. Young , 89 Mich.App. 753, 282 N.W.2d 211, 214-15 (1979) (finding no probable cause where sleeping occupant of vehicle awoke on approach of officer, removed foil packet from pocket and dropped or threw packet to floor); Hollis v. Commonwealth , 216 Va. 874, 223 S.E.2d 887, 888-89 (1976) (finding probable cause where officers had reliable tip describing vehicle, where it would be, and that it would be transporting drugs, and officer observed occupant with hand rolled cigarette that appeared to be marijuana throw it to floor of vehicle); People v. Howell , 394 Mich. 445, 231 N.W.2d 650, 651 (1975) (finding probable cause where bag bulging with variety of jewelry observed on initial contact, then concealed, and vehicle occupant responded "what bag" when asked what happened to it).

The three cases cited by the majority are distinguishable. In McLaughlin , the Third Circuit upheld the issuance of a warrant to search the defendant's vehicle and a bag seized from the vehicle. United States v. McLaughlin , 571 F. Appx. 147, 149 (3rd Cir. 2014). After stopping the defendant on suspicion of driving under the influence, officers searched his pockets with his consent and incident to conducting a sobriety test. Id . at 147-48. They found a cash bundle of $940 in a pocket and observed cash in a bag that the defendant tried to reach as he was being arrested. Id . at 148. The officers seized the bag and vehicle and applied for a search warrant, which they supported with an officer's affidavit stating that in his experience cash like that observed is associated with sale of illegal drugs. Id . The Third Circuit stated:
In our view, McLaughlin's efforts to reach the bag during his arrest as well as the fact that officers could see cash inside the bag in plain view supplied them with probable cause to believe they would find evidence of drug transactions in the bag or vehicle.
Id. at 149.
McLaughlin differs from the case before us in a couple of respects. First, the incriminating nature of the cash was immediately apparent to the officers, whereas the pouch in this case did not have distinctive characteristics that would make its incriminating nature immediately apparent. Additionally, McLaughlin addressed a search warrant, not a warrantless search. This is significant because different presumptions attach to warrantless searches and those conducted pursuant to a warrant. See Owens v. State , 2012 WY 14, ¶ 10, 269 P.3d 1093, 1096 (Wyo. 2012) (warrantless search is presumptively unreasonable and State bears burden of proving its legality); Holzheuser v. State , 2007 WY 160, ¶ 7, 169 P.3d 68, 74 (Wyo. 2007) (search warrant affidavit bears presumption of validity). As one commentator has observed:
The United States Supreme Court has expressed a strong preference for the making of searches and seizures pursuant to search warrant, even to the point of declaring that "in a doubtful or marginal case [of probable cause] a search under a warrant may be sustainable where without one it would fail."
2 LaFave, supra , § 4.1 (footnote omitted) (quoting United States v. Ventresca , 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) ).
Hicks is also different. In that case, an officer observed baggies and a scale with white powder on it that were left in the vehicle in plain view, and the officer testified that in his experience when these items are in a vehicle, they are indicative of narcotics trafficking. United States v. Hicks , 190 F.Supp.3d 733, 744 (S.D. Ohio 2016). Again, the incriminating nature of the scale and baggies was immediately apparent, distinguishing Hicks from the case before us.
West also involved a significant distinguishing factor: the officer knew the odor of methamphetamine and he detected that odor. United States v. West , 219 F.3d 1171, 1178 (10th Cir. 2000). In upholding the search, the Tenth Circuit considered all the circumstances, but it also observed, "An officer's detection of the smell of drugs, such as methamphetamine, in a car is entitled to substantial weight in the probable cause analysis and can be an independently sufficient basis for probable cause."Id. at 1178. I agree. Had Deputy Colling detected the scent of drugs, this case no doubt would have gone the way of West . See Phippen , ¶ 15, 297 P.3d at 109 (citing McKenney , ¶¶ 9-10, 165 P.3d at 98 ) ("[T]he odor of contraband, standing alone, can supply probable cause."). Unfortunately, that did not happen, and West is therefore distinguishable.

Mr. Pier's arguments pertain to the period when he was detained away from his vehicle. Mr. Pier does not contend, and the record contains no evidence, that Deputy Colling instructed Mr. Pier to leave his door open or in any manner prevented him from closing the door when he exited the vehicle.

I do not suggest that a dog handler's testimony is required in every case in which a drug dog is used, or even in any case in which the dog enters a vehicle. In cases such as this, the State bears the burden of proving that the drug dog entered the vehicle instinctually and not by training or direction. If proof other than the handler's testimony is available and admissible, I would have no difficulty in upholding a finding based on that proof.

I would not intend the Howard language to change any of this Court's prior holdings regarding drug dog reliability but to instead illustrate the need for qualified evidence to explain the actions of a drug dog and his or her handler.

In this regard, I am troubled by some assertions made in the State's brief. In its statement of issues, the State presents its third issue as:
A drug dog's spontaneous entry and sniff into a vehicle does not require the suppression of any evidence revealed, so long as the officers do not encourage the entry. The drug dog entered Pier's truck through a door he left open, and both officers testified that they did not encourage the dog to enter the car. Did the district court clearly err in finding that the dog's entry and sniff of the car was spontaneous?
As I have indicated, both officers did not testify. Only Deputy Colling testified, and he provided no testimony on the question of whether Frosty was encouraged to enter the vehicle. Additionally, the State asserted in its briefing that "[t]he evidence in the record shows that Frosty does not make a habit of bursting into vehicles." In making this assertion, the State provided a record cite that was to the district court's suppression order. The order is not evidence, and, in any event, the order itself contained no such finding. I urge counsel to use caution when making assertions of fact and to ensure that those assertions accurately reflect the record evidence.